Raymond KING, Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 88SC405.

Supreme Court of Colorado,
En Banc.

Jan. 16, 1990.

David F. Vela, Colorado State Public Defender and Douglas D. Barnes, Deputy State Public Defender, Denver, for petitioner.

Robert M. Brown and Linda A. McMahan, Chief Deputy Dist. Attys., Colorado Springs, for respondent.

Chief Justice QUINN delivered the Opinion of the Court.

We granted certiorari to review the decision of the court of appeals in *People v. King*, 765 P.2d 608 (Colo.App.1988). In affirming the conviction of the defendant, Raymond King, on two counts of murder in the first degree after deliberation, the court of appeals held that the defendant's statements concerning his actions and thoughts during and shortly after the killings, made to a defense-retained psychiatrist during pretrial psychiatric examinations, were not admissible under Colorado Rule of Evidence 803(4) because "[t]he truthfulness and candor rationale for the hearsay exception is absent" when such statements are made to a nontreating psychiatrist for the purpose of enabling the psychiatrist to testify at trial on the defendant's state of mind at the time of the offenses. *Id.* at 609. Although we reject the analysis utilized by the court of appeals, we nonetheless affirm the judgment. In our view, the defendant's statements to the psychiatrist qualified for admission under CRE 803(4), but the exclusion of such testimony was harmless error under the circumstances of this case.

I.

The defendant was charged by indictment in the District Court of El Paso County with two counts of first degree murder after deliberation.[1] The crimes were committed on March 24, 1985, and the victims of the offenses were the defendant's wife, Mona Rhea King, and the wife's sister, Carla Michelle Cannon.

The basic facts underlying the issue before us are not in dispute. The defendant and his wife Mona had been married for six years and lived with their five-year-old daughter, Tara, in Colorado Springs. In late 1984 or early 1985, Mona's sister, Carla Michelle Cannon, moved into the home. Shortly thereafter marital problems developed between the defendant and his wife, and in March 1985 the defendant moved to Pueblo to live with his younger brother Robert. The house in which Robert lived belonged to Herbert Ritchey, a friend of the King family. Ritchey had a collection of guns and ammunition in the house.

Because the defendant was upset over his marital problems, he took off from work for a week in early March and went to Kansas to visit his wife's parents. The defendant's father and the defendant's daughter accompanied him on the trip. The defendant appeared extremely distressed during the visit and made known the fact that he did not want a divorce. After returning to Colorado, while talking with his daughter during weekend visitation, the defendant learned that his wife had spent the weekend with another man. The defendant took off from work another week to consult an attorney about obtaining a divorce and custody of his daughter.

During the weekend of March 23–24, 1985, the defendant again had custody of his daughter and was to return his daughter to his wife on Sunday. On Sunday morning, however, the defendant dropped off his daughter at his parents' home in Pueblo. The defendant then took two .22 caliber revolvers and some ammunition from Ritchey's house and drove his brother's pickup truck to Colorado Springs in order to talk with Mona. One of Mona's neighbors observed the defendant talking to Mona in the morning outside Mona's house and also saw the defendant drive away shortly thereafter in a pickup truck. Another neighbor noticed the pickup truck earlier driven by the defendant in the driveway of Mona's house at about 4:00 p.m.

---

1. Section 18–3–102, 8B C.R.S. (1986), states:
   (1) A person commits the crime of murder in the first degree if:
     (a) After deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person or of another person.
   The term "after deliberation" is defined in section 18–3–101(3), 8B C.R.S. (1986), as follows:

The term "after deliberation" means not only intentionally but also that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act. An act committed after deliberation is never one which has been committed in a hasty or impulsive manner.

and also saw Mona return home in her car a few minutes later. Shortly thereafter this same neighbor saw that the pickup truck had left the scene.

The next day, March 25, the defendant's father became concerned because the defendant had not picked up his daughter to return her to Mona. The father telephoned Mona but received no answer and drove to Colorado Springs. Finding Mona's house locked, the father looked through a window and saw a body on the kitchen floor and immediately telephoned the police.

The police found the bodies of the defendant's wife and his sister-in-law inside the home. Mona's body was near the front door. She had been shot seven times with two different weapons. Carla's body was inside the door leading from the kitchen to the outside patio. She had been shot five times.

The next day, March 26, the defendant was arrested while driving a pickup truck in a southerly direction on Interstate Highway 25. The arresting officers recovered two fully loaded revolvers and several .22 caliber cartridges from the pickup truck and several other .22 caliber cartridges from the defendant's pocket. The defendant at the time of the arrest was wearing bloodstained clothes. The truck driven by the defendant was later identified as the same truck observed outside his wife's house on Sunday morning. A firearms expert testified that the shell casings at the scene of the crimes as well as the bullets recovered from the bodies of the defendant's wife and sister-in-law were fired from the revolvers taken from Ritchey's house in Pueblo.

At trial, defense counsel called a defense-retained psychiatrist, Doctor William Ingram, who had examined the defendant on several occasions while the defendant was in the Colorado State Hospital and in the county jail awaiting trial. Defense counsel elicited from Doctor Ingram, without objection by the prosecution, the methodology used by psychiatrists in evaluating an accused's mental state. Doctor Ingram testified that the history given to him by an accused plays a significant part in psychiatric diagnosis. The doctor testified that he obtained information from the defendant about his family and educational background, his marital status, his social and medical history, and the events surrounding the crimes in question. The doctor also questioned members of the defendant's family, studied the defendant's medical records at the state hospital, where the defendant had undergone a competency examination in connection with the pending charges, and then questioned the defendant about the crimes and evaluated the defendant's reactions to those questions. Defense counsel then sought to elicit from Doctor Ingram that part of the psychiatric examination in which the defendant described to the doctor his actions and thoughts during and shortly after the killings. The prosecution objected to this testimony as hearsay, and the trial court sustained the objection. The trial court, however, ruled that defense counsel would be permitted to make an offer of proof later in the trial.

Defense counsel then resumed the examination of Doctor Ingram before the jury. Doctor Ingram gave his opinion, again without objection by the prosecution, that the defendant was suffering from severe depression and "emotional overload" at the time of the killings as a result of his deteriorating marriage and his concern over the custody of his daughter; that the defendant had intended to kill himself in the event he was not successful in getting his wife to talk to him "in this last try" but suddenly redirected his suicidal impulse to homicidal actions against his wife and sister-in-law; and that it was very unlikely, although not impossible, that the defendant planned to kill his wife and sister-in-law on this occasion.[2]

2. Defense counsel also presented testimony from another psychiatrist who had examined the defendant in May 1985 at the Colorado State Hospital for the purpose of determining the defendant's competency to proceed. This psychiatrist testified, without objection by the prosecution, that at the time of the competency examination the defendant was suffering from a depressive disorder and was suicidal. This doctor also testified that the defendant described

At the conclusion of Doctor Ingram's direct examination, defense counsel made an offer of proof outside the presence of the jury with respect to the defendant's statements to Doctor Ingram concerning his actions and thoughts during and shortly after the killings. Defense counsel stated that Doctor Ingram would testify that the defendant made the following statements to him during the psychiatric examinations: that the defendant had no intention to shoot his wife or anyone else, but obtained the pistols for the purpose of threatening to shoot himself in order to get his wife's attention; that as the defendant was sitting on the couch, waiting for his wife to return, he told his sister-in-law that he intended to shoot himself and pulled the gun out of a bag and placed it next to himself; that as his sister-in-law moved towards him to try to get the gun, the defendant shot her; that he then reloaded, intending to shoot himself, but his wife came through the door, and that the defendant did not specifically recall shooting his wife and had no memory of his activities until he was driving in the mountains where he finally fell asleep in the pickup truck. Defense counsel argued that such statements were admissible under CRE 803(4) as statements made for the purpose of medical diagnosis and also were admissible under CRE 703 as facts or data on which Doctor Ingram based his expert opinion about the defendant's mental state at the time of the killings.

The trial court rejected defense counsel's offer of proof. In its ruling, the trial court failed to consider whether such evidence might be admissible under CRE 803(4) as statements made for the purpose of a psychiatric diagnosis. Instead, the trial court acknowledged that such evidence might be admissible under CRE 703 as facts or data underlying Doctor Ingram's expert opinion, but stated that the defendant's statements to the doctor were self-serving and that their admission for the limited purpose of serving as a basis for Doctor Ingram's opinion would unduly confuse the jury.

At the conclusion of the evidence, the trial court instructed the jury on the elements of first-degree murder after deliberation and the lesser included offense of second-degree murder. The jury returned guilty verdicts on both counts of first-degree murder, and the trial court imposed consecutive life sentences on each conviction.

The court of appeals affirmed the trial court's exclusion of Doctor Ingram's testimony concerning the details of the crimes in question, reasoning as follows:

> Out-of-court statements made by the defendant to a non-treating physician are admissible under CRE 803(4) as an exception to the hearsay rule. *People v. Stiles*, 692 P.2d 1124 (Colo.App.1984). However, because the motives for truth and candor may be lacking when a defendant makes statements to a non-treating physician in anticipation of his defense at trial, the defendant must demonstrate that his purpose was consistent with the rationale behind the rule and that it was reasonable for the physician to rely upon the information. Moreover, the evidence may still be excluded if it is irrelevant or if it does not satisfy the balancing test set out in CRE 403. *People v. Stiles, supra.*[3]

how shortly before the killings he was angry at his wife because she and her sister were attempting to disrupt his marriage and his relationship with his daughter. In answer to a hypothetical question, the doctor stated that the defendant's depressive mood shortly prior to the killings, his preoccupation with the prospective divorce and his relationship to his daughter, and his inability to work and communicate with his wife were consistent with the diagnosis of depressive disorder.

3. In *People v. Stiles*, 692 P.2d 1124 (Colo.App. 1984), the court of appeals considered the ad-

missibility of a defendant's statements to a non-treating psychiatrist during a psychiatric evaluation conducted for the purpose of ascertaining the defendant's mental state at the time of the fatal shooting of his wife. The court acknowledged that CRE 803(4) "allows admission of a non-treating physician's recital of a defendant's statements for the truth of the matters they contain," but then seemed to engraft on the rule the further requirement that a defendant offering such statements into evidence must independently establish that his motive in undergoing the psychiatric evaluation was somehow "consistent with the purpose of the rule." *Id.* To

*King,* 765 P.2d at 609. The court of appeals concluded that since, in its view, the defendant's statements lacked adequate guarantees of trustworthiness, their admission would have resulted in the defendant's making use of Doctor Ingram as a "surrogate witness to repeat his statements while refusing to submit himself to cross-examination." *Id.* In keeping with its analysis, the court of appeals also concluded that the trial court properly exercised its discretion in ruling that such statements were not admissible under CRE 703 as facts or data in support of Doctor Ingram's expert opinion concerning the defendant's mental state at the time of the killings. We granted the defendant's petition for certiorari to consider whether the defendant's statements concerning his actions and thoughts surrounding the killings, made to Doctor Ingram during the doctor's pretrial psychiatric examinations of the defendant, qualified for admission under the hearsay exception created by CRE 803(4).

## II.

The Colorado Rules of Evidence, which are substantially based on the Federal Rules of Evidence, became effective on January 1, 1980, and provide the framework for resolving the evidentiary issue before us. These rules are designed to promote the "growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." · CRE 102.

CRE 801(c) defines hearsay as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *See generally People v. Madson,* 638 P.2d 18, 26–27 (Colo. 1981); V J. Wigmore, *Evidence* § 1361

(Chadbourn ed. 1974); C. McCormick, *Evidence* § 246 (Cleary ed. 1972). Hearsay evidence is not admissible "except as provided by [the Colorado Rules of Evidence] or by the civil and criminal procedural rules applicable to the courts of Colorado or by any statutes of the State of Colorado." CRE 802. CRE 803 creates various exceptions to the hearsay exclusionary rule, even though the declarant is available as a witness. These exceptions proceed from the theory that "under appropriate circumstances a hearsay statement may possess circumstantial guarantees of trustworthiness sufficient to justify nonproduction of the declarant in person at the trial even though [the declarant] may be available." Fed.R.Evid. 803, Advisory Committee's Note, 56 F.R.D. 303 (1972).

CRE 803(4), which is identical to Fed.R. Evid. 803(4), provides that the following statements are not excluded by the hearsay rule, even though the declarant is available as a witness:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

By its terms, CRE 803(4) includes three types of statements that qualify for the hearsay exception when made for purposes of medical diagnosis or treatment insofar as such statements are reasonably pertinent to diagnosis or treatment: statements describing medical history; statements of past or·present symptoms, pain, or sensations; and statements describing the inception or general character of the cause or external source of the past or present symptoms, pain, or sensations.[4]

---

the extent that *Stiles* can be read as requiring a proponent of the hearsay statement to make some independent demonstration of the trustworthiness of the statement as a prerequisite to admissibility, *Stiles* is expressly overruled.

**4.** Prior to the adoption of CRE 803(4), courts took varied approaches to statements made to physicians consulted for purposes of diagnosis in anticipation that the physician will testify on the party's behalf. Some held that such state-

ments were inadmissible for any purpose, while others admitted such evidence for the limited purpose of explaining the basis of the physician's opinion, and still others permitted the physician to render an opinion based solely upon objective facts personally observed by him or upon hypothetical questions. C. McCormick, *Evidence* § 692 (Cleary ed. 1972). CRE 803(4) makes no such distinctions in defining the hearsay exception. *See generally United States v. Iron Shell,* 633 F.2d 77, 83 (8th Cir.1980), *cert.*

■ It is this hearsay exception created by CRE 803(4) which is central to the resolution of this case. The defendant argues that the court of appeals erred in concluding that his statements to Doctor Ingram concerning his actions and thoughts during and shortly after the killings were reasonably pertinent to the doctor's psychiatric diagnosis of the defendant's mental condition and thus qualified for admission under CRE 803(4). The People, on the other hand, argue that such statements are not admissible under CRE 803(4) because they were made for the purpose of enabling Doctor Ingram to testify on a matter at issue in pending litigation. For reasons hereinafter stated, we conclude that the defendant's statements to Doctor Ingram were statements made for purposes of psychiatric diagnosis and satisfied the criteria for admissibility under CRE 803(4).

### A.

Prior to the adoption of the Colorado Rules of Evidence, a psychiatrist who examined a party for the purpose of evaluating the party's mental condition in connection with pending litigation could testify to the history related by the party for the limited purpose of serving as factual support for the psychiatrist's opinion. *People v. Parks*, 195 Colo. 344, 348, 579 P.2d 76, 78 (1976); *see Houser v. Eckhardt*, 168 Colo. 226, 233, 450 P.2d 664, 668 (1969). The party's statements to the psychiatrist, in other words, were not viewed as evidence of the truth of the matters asserted, and hence were not hearsay, but rather were considered as "merely explanatory of the opinion, enabling the jury to weigh it in light of its basis." *Parks*, 195 Colo. at 348, 579 P.2d at 78 (quoting *Houser*, 168 Colo. at 223, 450 P.2d at 668).

This rule of limited admissibility has been criticized as highly impracticable. The expectation that the jury will consider such statements "only as an explanation of the basis for an opinion and not as proof of the truth of those declarations is probably beyond the ability and inclination of jurors." C. McCormick, *Evidence* § 293 at

694. Moreover, "[t]he general reliance upon 'subjective' facts by the medical profession and the ability of its members to evaluate the accuracy of assertions made to them seem sufficient protections against contrived symptoms leading to erroneous expert testimony." *Id.*

In recognition of the flaws inherent in admitting such statements solely for the limited purpose of serving as a basis for an expert opinion, the Advisory Committee's Note to Federal Rule of Evidence 803(4) states as follows:

> Conventional doctrine has excluded from the hearsay exception, as not within its guarantee of trustworthiness, statements to a physician consulted only for the purpose of enabling him to testify. While these statements were not admissible as substantive evidence, the expert was allowed to state the basis of his opinion, including statements of this kind. The distinction thus called for was one most unlikely to be made by juries. The rule accordingly rejects the limitation.

Fed.R.Evid. 803(4) Advisory Committee's Note, 56 F.R.D. 306 (1972). Fed.R.Evid. 803(4) thus was clearly intended to abolish the distinction between the doctor "who is consulted for the purpose of treatment" and the doctor who examines a party "for the purpose of diagnosis only," even though the latter "is consulted only in order to testify as a witness." *United States v. Iron Shell*, 633 F.2d 77, 83 (8th Cir.1980) *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). Although we are not bound by federal precedent interpreting the Colorado counterpart of the Fed.R. Evid. 803(4), the fact that CRE 803(4) is a mirror image of the federal rule prompts us to construe the Colorado rule in light of the text and purpose of the federal rule.

■ Under CRE 803(4), therefore, the mere fact that a psychiatrist examines a party for the purposes of evaluating the party's mental condition with respect to an issue in pending litigation does not render the party's statements beyond the pale of

*denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981).

the hearsay exception when such statements are reasonably pertinent to psychiatric diagnosis. The plain terms of CRE 803(4) speak not only of statements made for purposes of treatment but also of statements made for purposes of diagnosis, and the obvious intent of the rule is to include within the hearsay exception a party's statement to a nontreating psychiatrist for purposes of diagnosis in connection with pending litigation. *See* Fed.R.Evid. 803(4), Advisory Committee's Note, 56 F.R.D. 304 (1972); *United States v. Lechoco*, 542 F.2d 84, 89 n. 6 (D.C.Cir.1976). A statement reliable enough to serve as the basis for psychiatric diagnosis should also be considered reliable enough to escape the hearsay proscription. 4 J. Weinstein & M. Berger, *Weinstein's Evidence* 803–148 (1988); *see generally O'Gee v. Dobbs Houses, Inc.*, 570 F.2d 1084, 1089 (2nd Cir.1978).[5]

The concern is sometimes raised that, because psychiatric diagnosis deals with subjective feelings to a much greater extent than other forms of medicine, a court should exercise considerable caution in assuring itself that a party's statements to a nontreating psychiatrist do not represent a veiled effort to exaggerate or falsify the facts. *See* D. Louisell & C. Mueller, *Federal Evidence* § 444, at 611 (1980). This same concern, however, is present to some extent in other forms of medical diagnosis based in part upon a party's statements to an examining physician, including, for example, statements made by a party-plaintiff to a physician for purposes of diagnosis in connection with pending litigation, *see generally O'Gee*, 570 F.2d at 1089, and statements made by a child-victim of a sexual offense made to a psychiatrist or pediatrician for purposes of diagnosis or treatment, *see, e.g., United States v. Renville*, 779 F.2d 430, 435–39 (8th Cir.1985); *Iron Shell*, 633 F.2d at 85. In our view, this concern over the possibility of exaggerated or false testimony coming into evidence under the aegis of CRE 803(4) is effectively allayed by the rule itself, which requires as a foundation for admission that the proponent establish that statements made to a nontreating psychiatrist be reasonably pertinent to diagnosis and be relied upon by the psychiatrist in arriving at an expert opinion on the mental condition in issue. Here again, the rationale for the hearsay exception of CRE 803(4) is that physicians, by virtue of their training and experience, are quite competent to determine whether particular information given to them in the course of a professional evaluation is "reasonably pertinent to diagnosis or treatment" and are not prone to rely upon inaccurate or false data in making a diagnosis or in prescribing a course of treatment.[6]

---

**5.** When psychiatric testimony is admitted pursuant to CRE 803(4), the credibility of the declarant is open to attack under CRE 806, which states, in pertinent part, that "[w]hen a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported by any evidence which would be admissible for these purposes if declarant had testified as a witness." CRE 806 also states that "[e]vidence of a statement or conduct by the declarant at any time, inconsistent with his hearsay statement, is not subject to any requirement that he may have been afforded an opportunity to deny or explain." *See United States v. Lechoco*, 542 F.2d 84, 89 n. 6 (D.C.Cir.1976).

**6.** Since statements qualifying for the hearsay exception created by CRE 803(4) are admissible for the truth of the matter asserted, such statements, when admitted, can be utilized for all purposes, including the more limited purpose of serving as the basis for an expert opinion pursuant to CRE 703, which states:

The facts or data in the particular case upon which an expert bases an opinion or inference

may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Since psychiatric history must be "reasonably pertinent to diagnosis or treatment" to qualify for admission under CRE 803(4), it necessarily follows that such statements would constitute facts or data "reasonably relied upon by experts" in psychiatry in forming their opinions or inferences for purposes of CRE 703. Of course, there will be cases where the person being examined by a psychiatrist might be hallucinatory and give bizarre and untrue statements. In such cases, the statements would not be hearsay, since they would not be offered for the truth of the matter asserted. An instruction telling the jury that such statements should be considered only for the limited purpose of serving as some support for the psychiatric opinion would be appropriate. We are not dealing here with such a case.

### B.

The court of appeals in this case affirmed the exclusion of the statements made by the defendant to Doctor Ingram simply because Doctor Ingram was conducting the psychiatric examinations for the purpose of testifying at the defendant's trial on the defendant's mental condition at the time of the crimes in question. In the court of appeals' view, it was incumbent upon the defendant under these circumstances to make an independent demonstration "that his purpose was consistent with the rationale behind the rule and that it was reasonable for the physician to rely upon the information." *King*, 765 P.2d at 609. We reject the analysis employed by the court of appeals in resolving this evidentiary issue.

■ As previously discussed, the hearsay exception created by CRE 803(4) is itself predicated on considerations of trustworthiness and does not contemplate that a party's statements made to a nontreating physician for the purpose of diagnosis in connection with pending litigation must be supported by some independent demonstration of trustworthiness as a prerequisite to admissibility. On the contrary, once the proponent of the hearsay statements establishes that they were made to a physician for purposes of either diagnosis or treatment, and that such statements were reasonably pertinent to diagnosis or treatment and were relied on by the physician in arriving at an expert opinion, the statements themselves qualify for admission under the rule without regard to any independent demonstration of trustworthiness.

In the instant case, Doctor Ingram testified that the defendant's statements concerning the crimes were pertinent to the diagnosis of the defendant's mental condition at the time of the offenses and were relied upon by the doctor in reaching an expert opinion on that aspect of the case. Defense counsel's offer of proof with re-

spect to the defendant's statements to Doctor Ingram clearly showed that the statements related to the events immediately surrounding the killings. The proffered evidence was within the scope of CRE 803(4) because, as expressly stated in the rule, such statements described the defendant's "medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof" and were "reasonably pertinent to diagnosis."

### III.

■ The fact that hearsay evidence may qualify for admission under CRE 803(4) does not mean that a trial court is required to admit such evidence under any and all circumstances. CRE 403 authorizes a court to exclude relevant evidence [7] "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We recognize that a decision to exclude evidence under CRE 403 is a matter left to the sound discretion of the trial court and will not be overturned on appeal in the absence of an abuse of discretion. *People v. Lowe*, 660 P.2d 1261, 1264 (Colo.1983). We may properly conclude that a trial court has abused its discretion in excluding evidence if, based on the particular circumstances confronting the court, the court's evidentiary ruling was manifestly arbitrary, unreasonable, or unfair. *See People v. Hampton*, 758 P.2d 1344, 1348 (Colo.1988); *People v. Milton*, 732 P.2d 1199, 1207 (Colo.1987). We are satisfied that in this case the trial court's exclusion of the defendant's statements to Doctor Ingram was manifestly unreasonable.

■ Although defense counsel offered this evidence under the hearsay exception

---

7. Evidence is "relevant" when it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401; *see People v. Carlson*, 712 P.2d 1018, 1021–22 (Colo.1986). The Colo-

rado Rules of Evidence strongly favor the admission of proffered evidence satisfying the materiality requirement and the probability standard of CRE 401. *People v. Lowe*, 660 P.2d 1261, 1264 (Colo.1983).

created by CRE 803(4), and also under CRE 703 as facts or data supportive of Doctor Ingram's expert opinion, the trial court failed to consider the admissibility of the proffered evidence under CRE 803(4). Rather, the trial court in its ruling acknowledged that such evidence might be admissible under CRE 703, but then ruled that the admission of such evidence under CRE 703 would unduly confuse the jury. Prior to the trial court's ruling on the proffered evidence, however, Doctor Ingram testified at some length concerning the purpose of psychiatric history and its relationship to a psychiatric diagnosis. The doctor stated that an accurate diagnosis of the defendant's mental condition at the time of the offenses required an analysis of information regarding the defendant's recollection of his actions and thoughts during and shortly after the crimes as well as an analysis of information obtained from the defendant and others regarding the defendant's background and life situation. Doctor Ingram was permitted to relate the history given to him by the defendant concerning his background, and his deteriorating relationship with his wife and his concern over the custody of his daughter. The doctor further testified, again prior to the trial court's exclusionary ruling, that he utilized all the information concerning the defendant in directing questions to the defendant about his actions at the time of the killings and his reaction to those particular events. There can be no question, therefore, that the doctor made significant use of the defendant's statements about his actions and thoughts during and shortly after the killings in arriving at a diagnosis of the defendant's mental state at the time of the crimes. Under this state of the record, where the defendant's statements to Doctor Ingram concerning the crimes in question were offered into evidence under CRE 803(4), the trial court erred in not addressing the admissibility of such evidence under CRE 803(4). Furthermore, in light of Doctor Ingram's testimony relating some of the history given to him by the defendant and the doctor's testimony concerning the significance of the defendant's statements about the crimes in question to the doctor's expert opinion on the defendant's mental state at the time of the killings, there was no reason whatever for the trial court to exclude the proffered evidence as unduly confusing to the jury. The record demonstrates that, in view of the particular circumstances confronting the trial court at the time of the defendant's evidentiary offer, the trial court's exclusion of the defendant's statements to Doctor Ingram concerning his actions and thoughts during and shortly after the killings constituted an abuse of discretion.[8]

## IV.

We are left then to consider whether the trial court's exclusion of the defendant's statements to Doctor Ingram is harmless error or, instead, requires a reversal and a new trial. A ruling admitting or excluding evidence is not reversible unless the ruling affects a substantial right of the party

---

**8.** The People argue that the defendant's statements to Doctor Ingram concerning his actions and thoughts at the time of the killings were properly excluded because such statements represented an effort by the defendant to establish the defense of impaired mental condition when no such defense was raised by special plea as required by section 16-8-103.5, 8A C.R.S. (1986). The defense of "impaired mental condition" means "a condition of mind, caused by mental disease or defect, which does not constitute insanity but, nevertheless, prevents the person from forming a culpable mental state which is an essential element of a crime charged." § 16-8-102(2.7), 8A C.R.S. (1986). The defense of impaired mental condition must be pled at the time of arraignment or, for good cause shown and with the permission of the court, at

some time prior to trial. § 16-8-103.5(1), 8A C.R.S (1986).

Although the defendant failed to plead the defense of impaired mental condition, the record unequivocally shows that the prosecution did not object on that basis to Doctor Ingram's opinion regarding the defendant's mental state at the time of the killings. In light of the People's failure to raise at trial the defendant's nonassertion of the defense of impaired mental condition, the People have lost the right to raise on appeal, as support for the trial court's ruling, the defendant's nonassertion of this defense. *See Steagald v. United States,* 451 U.S. 204, 208–11, 101 S.Ct. 1642, 1646–47, 68 L.Ed.2d 38 (1981); *People v. Sporleder,* 666 P.2d 135, 139 (Colo.1983).

against whom the ruling is made. CRE 103(a); *see also* C.A.R. 35(e) (appellate court shall disregard any error not affecting substantial right of party); Crim. P. 52 (any error not affecting substantial rights shall be disregarded). "If a reviewing court can say with fair assurance that, in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of the trial, the error may properly be deemed harmless." *People v. Gaffney*, 769 P.2d 1081, 1088 (Colo.1989); *see also Tevlin v. People*, 715 P.2d 338, 341–42 (Colo.1986); *Callis v. People*, 692 P.2d 1045, 1053 (Colo.1984).

■ The evidentiary state of the record is such that we can say with fair assurance that the trial court's exclusion of that portion of the psychiatric history in which the defendant described to Doctor Ingram his actions and thoughts during and shortly after the killings did not affect any substantial right of the defendant. There was much evidence before the jury concerning the defendant's version of how the killings occurred. Doctor Ingram, for example, testified that in his opinion the defendant, at the time of the killings, was suffering from a severe depression and emotional overload as a result of the deterioration of his marriage and his concern over the custody of his young daughter. The doctor went on to testify that the defendant intended to kill himself if he was not able "to get his wife to talk to him in this last try," that he suddenly redirected his suicidal impulse to his sister-in-law and wife, and that it was very unlikely, although not impossible, that the defendant planned to kill his wife and sister-in-law.[9] Doctor Ingram's testimony was replete with references to the defendant's emotional state at the time of the killings, based again in part on the defendant's statements made to the doctor during the psychiatric examinations.

Considering Doctor Ingram's testimony in its entirety, we are satisfied that there is very little in defense counsel's offer of proof that had not already been incorporat-

ed into the doctor's testimony before the jury. The record, in our view, dispels the notion that the evidentiary ruling at issue here had any substantial influence on the verdict or impaired the fairness of the trial.

We accordingly affirm the judgment of the court of appeals.

---

**9.** CRE 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the jury."