Bob BEAUPREZ, Steve Miller, Sue Mitchell, Cheri Ofner, Paul Schauer, Scott Tipton, and Gerald Groswold, Petitioners,

v.

Rita AVALOS, Lori Fox, Dan Friesen, Ann Knollman, Rick Swain, and Tony Young, Respondents,

and

The City and County of Denver and Mayor Wellington Webb, Intervenors.

No. 02SC87.

Supreme Court of Colorado, En Banc.

March 13, 2002.

Friedlob Sanderson Paulson & Tourtillott, LLC, Christopher R. Paulson, Richard C. Kaufman, Denver, Colorado, Attorneys for Petitioners.

Jean E. Dubofsky, PC, Jean E. Dubofsky, Boulder, Colorado, Burke & Neuwirth, PC, Dean Neuwirth, Denver, Colorado, Attorneys for Respondents.

Brownstein Hyatt & Farber, Lynne Hufnagel, P. Cole Finegan, Richard P. Barkley, Denver, Colorado, Attorneys for Congressman Mark Udall.

Isaacson Rosenbaum Woods & Levy, Mark G. Grueskin, Timothy P. Daly, T. Barton French, Jr., Denver, Colorado, City Attorney's Office, J. Wallace Wortham, Jr., David W. Broadwell, Denver, Colorado, Attorneys for The City and County of Denver and Mayor Wellington Webb.

Denis Berckefeldt, Denver, Colorado, pro se.

Justice MARTINEZ delivered the Opinion of the Court.

This case involves the redistricting of the Colorado congressional districts pursuant to the results of the 2000 census, which determined that Colorado is entitled to a seventh representative in the United States House of Representatives. On January 25, 2002, the Denver District Court ("the district court") issued an order decreeing that the current congressional districts as set forth in section 2–1–101, 1 C.R.S. (2001), are unconstitutional and that the Secretary of State of Colorado, Donetta Davidson ("Davidson") is enjoined from conducting the November 2002 congressional district elections pursuant to the current congressional districts. The district court also adopted a redistricting map originally proposed by the Republican leadership, but as modified by the plaintiffs below ("the Avalos plaintiffs"), known as the Amendment to Republican Leadership map ("ARL map").

Petitioners here, intervenors below ("Beauprez"),[1] appealed to the court of appeals, but asked us to issue a writ of certiorari before argument and judgment in that court. On February 7, 2002, we granted certiorari. We now address the following issues: (1) whether the district court properly found that it had jurisdiction in this matter; (2) whether the district court diluted minority voting strength contrary to the Voting Rights Act, 42 U.S.C. § 1973 (1988), and the United States Constitution; (3) whether the district court contravened the requirements of section 47 of the Colorado Constitution; and (4) whether the district court contravened the constitutional mandate regarding the enactment of legislation found in Articles III, IV, and V of the Colorado Constitution. On February 26, 2002, we issued an order and mandate affirming the district court's adoption of the ARL map. We did so before issuing an opinion to expedite the process of determining the new congressional districts and to give the appropriate officials adequate time to prepare for the upcoming elections. In that order, we stated that a written opinion would follow in the near future. This is our opinion explaining the order and mandate of February 26, 2002.

### I. Facts and Procedure

With the results of the 2000 census, Colorado became entitled to a new seat in the United States House of Representatives. *See* U.S. Const. art. I, §§ 2, 3. The task of drawing congressional district boundaries is

---

1. The set of six intervenors that constitute the Beauprez petitioners are six individuals, each of whom lives in one of the six congressional districts as previously configured. In their motion to intervene, the six individuals described themselves as necessary intervenors because "[a]ll of the Plaintiffs are Democrats. All of the [intervenors] are Republicans. As such, [intervenors] are certain that their interests cannot be adequately represented by the Plaintiffs."

the province of the general assembly, pursuant to Article V, section 44 of the Colorado Constitution.[2] As with any legislation passed by the general assembly, the governor must sign such bill into law. Colo. Const. art. IV, § 11. The new congressional districts must be in place by March 11, 2002, to allow the November 2002 general elections to proceed.

Since being notified of Colorado's entitlement to a seventh congressional district on or about April 1, 2001, the general assembly has failed to complete the redistricting process on several occasions. It failed to promulgate a redistricting plan and present it to Governor Owens for his signature at the end of the regular session in 2001. It again failed to promulgate a plan during two special legislative sessions, the second of which ended on October 9, 2001.

Based on this legislative inaction, the Avalos plaintiffs, representing the interests of the State Democratic Party, filed the present action in the district court against Davidson, the Colorado Secretary of State, on May 31, 2001, after the general assembly concluded its regular session. The Avalos plaintiffs sought a declaration that the current congressional districts are unconstitutional and to begin the court process of redistricting if the legislature and governor failed to agree on a plan. Davidson filed a motion to dismiss, arguing that the Avalos plaintiffs lacked standing because the issue of congressional redistricting was not yet ripe, which the district court denied. The district court held a status conference on October 25, 2001, at which it ordered any parties that wished to intervene to do so by November 2, 2001. Seventeen sets of parties intervened. A trial to the court was held from December 17 to December 21, 2001, and again on December 27 and 28, 2001. At the close of trial, the district court announced that it would not issue its decision until January 25, 2002, in order to allow the general assembly another chance to agree on a plan when it convened for its regular session in January 2002. When the general assembly failed to act by the January 25 deadline, the district court issued its ruling adopting the ARL map.

### A. The District Court's Decision

The district court issued its decision in this case with both reluctance and certitude. Although the district court recognized that redistricting is the task of the general assembly, it also noted that "there has been a failure of the legislative branch and the Governor to adopt a constitutionally acceptable redistricting plan for the state of Colorado in a timely fashion, [so] this Court must now act and establish a constitutional redistricting plan for Colorado." *Avalos v. Davidson*, No. 01CV2897, slip. op. at 2 (Denver Dist. Ct. Jan. 25, 2002). It thus set about the task of establishing Colorado's congressional districts.

The district court considered over a dozen plans submitted by many of the parties. The district court heard testimony, including expert testimony, regarding Colorado's geography, ethnic communities, trade and political history, and theories of voter performance. After hearing this testimony, the court notified all parties that it was inclined to work from a map submitted by the representatives of the Republican party, the Republican Leadership Map ("RLM"). The court invited the parties to propose any amendments to the RLM for its consideration. As previously noted, the district court adopted the ARL map, which was an amended RLM and was submitted by the Avalos plaintiffs.

In reaching its decision to adopt the ARL map, the district court relied heavily on *Carstens v. Lamm*, 543 F.Supp. 68 (D.Colo.1982). *Carstens*, which involved the congressional redistricting of Colorado following the 1980 census, articulated the relevant constitutional and non-constitutional criteria that a court must employ when determining a redistricting plan. Specifically, *Carstens* held that a redistricting plan must satisfy two constitutional requirements: (1) equal population in

---

**2.** Section 44 states:

The general assembly shall divide the state into as many congressional districts as there are representatives in congress apportioned to this state by the congress of the United States for the election of one representative to congress from each district. When a new apportionment shall be made by congress, the general assembly shall divide the state into congressional districts accordingly.

each district, and (2) an absence of racial discrimination in the form of the dilution of minority voting strength. *Carstens*, 543 F.Supp. at 81–82. *Carstens* then went on to hold that, when the two constitutional requirements are met by several proposed plans, a court may consider the following non-constitutional factors in adopting a plan: (1) compactness and contiguity, (2) preservation of municipal boundaries, and (3) preservation of communities of interest. *Id.* at 82.

The district court discussed in detail each of the seven congressional districts of the ARL map that it adopted in the context of the *Carstens* criteria. Initially, the district court noted that, given the census numbers, the ideal population of each of the seven congressional districts would be approximately 614,000. The district court recognized that each of the seven districts in the ARL map met the constitutional requirement of equal population.[3] The district court also found that none of the districts in the ARL map unconstitutionally diluted minority voting strength.[4] After finding the two constitutional requirements satisfied, the district court considered the non-constitutional factors. When the district court determined that it needed to depart from one of these factors, it explained its reasoning. For example, the district court determined that it was necessary to violate some municipal and county boundaries in District 2. The district court explained, however, that such violation was necessary because a strong community of interest exists for the voters in District 2 around the Rocky Flats facility as well as the

development of the area around highway U.S. 36. The district court considered this community of interest as necessitating a single voice in congress. The district court was careful to explain its reasoning regarding the non-constitutional factors for each of the seven districts in the plan it adopted.

We determine that the process utilized by the district court in adopting a redistricting plan was thorough, inclusive, and non-partisan. The district court engaged in an even-handed approach to the complex and detailed process of congressional redistricting. It encouraged all parties and intervenors to submit proposed plans in order for it to adopt a plan that would reflect, as much as possible, the input of the general assembly and the governor, while satisfying the relevant constitutional and non-constitutional criteria.

## II. Jurisdiction

Beauprez first contends that the district court did not have jurisdiction over this matter. Specifically, Beauprez argues that Davidson, as secretary of state, was not the proper defendant because she does not have any role in drawing Colorado's congressional districts and that the case was not ripe for adjudication. Because Beauprez believes that subject-matter jurisdiction was lacking, he argues that the case should have been dismissed.

### A. The Secretary of State was the Proper Defendant

■■■ Beauprez's contention that Davidson is not the proper defendant is not per-

---

3. The district court stated that District 1, consisting of the City and County of Denver, approximately 60,000 people from Arapahoe County, and an "insignificant" number of people from Jefferson County, contains 614,465 people; District 2, consisting of part of Adams County, part of Boulder County, Clear Creek County, Eagle County, Gilpin County, Grand County, Jefferson County, Summit County, and part of Weld County, contains 614,465 people; District 3, consisting of the following counties: Alamosa, Archuleta, Conejos, Costilla, Custer, Delta, Delores, Garfield, Gunnison, Hinsdale, Huerfano, Jackson, La Plata, Las Animas, Mesa, Mineral, Moffat, Montezuma, Montrose, Ontario, Otero (part), Ouray, Pitkin, Pueblo, Rio Blanco, Rio Grande, Routt, Saguasche, San Juan, and San Miguel, contains 614,467 people; District 4, consisting of the counties of Baca, Bent, Boulder (part), Cheyenne, Crowley, Kiowa, Kit Carson,

Larimer, Logan, Morgan, Ortero (part), Phillips, Prowers, Sedgwick, Washington, Weld (part), and Yuma, contains 614,466 people; District 5, consisting of the counties of Chaffee, El Paso, Fremont, Lake, Park (part), and Teller, contains 614,467 people; District 6, consisting of most of Arapahoe County, Douglas County, Elbert County, a large portion of Jefferson County, and part of Park County, contains 614,466 people; and District 7, consisting of parts of Adams County, Arapahoe County, and Jefferson County, contains 614,465 people.

4. The district court recognized that the new District 1 would decrease the Hispanic population approximately 3.39% from the prior District 1, but found that such a decrease did not represent an unconstitutional dilution of minority voting strength.

suasive. The secretary of state is required by law to administer Colorado's congressional elections, and is thus a proper defendant. *See* § 1–1–107, 1 C.R.S. (2001). Further, the secretary of state is required to implement a court-ordered redistricting plan. *See In re Reapportionment of Colo. Gen. Assembly,* 647 P.2d 209, 213 (Colo.1982). In addition, the judiciary does not have the power to order the general assembly to convene, consider issues, or enact specific legislation, rendering the general assembly an improper defendant for the relief requested by the Avalos plaintiffs. *See, e.g., Lucchesi v. State,* 807 P.2d 1185, 1190 (Colo.Ct.App.1990). Furthermore, the judiciary cannot compel the governor to sign legislation, rendering Governor Owens an improper defendant for the relief sought by the Avalos plaintiffs. *See, e.g., Romer v. Colo. Gen. Assembly,* 840 P.2d 1081, 1084–85 (Colo.1992). Finally, all interested parties intervened, including representatives of the Republican and Democratic parties and Governor Owens.

Case law further supports our conclusion that Davidson was the proper defendant in this case. We have found numerous cases, all of them adjudicated on the merits, in which the secretary of state was named as the defendant in a congressional redistricting action. *See, e.g., Growe v. Emison,* 507 U.S. 25, 27, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993); *White v. Weiser,* 412 U.S. 783, 786, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Kirkpatrick v. Preisler,* 394 U.S. 526, 528, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969).

We conclude that Davidson, in her official capacity as secretary of state, was properly named as the defendant in this action.

### B. The Case was Ripe for Adjudication

■ Beauprez asserts that there was no case or controversy when this action was filed in May 2001, because the general assembly still had ample time and opportunity to enact a redistricting plan. We disagree.

■ Ripeness requires that there be an actual case or controversy between the parties that is sufficiently immediate and real so as to warrant adjudication. *Carstens,* 543 F.Supp. at 76 (citing *Lake Carriers' Ass'n v.*

*MacMullan,* 406 U.S. 498, 506, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972)). Thus, courts generally do not consider cases involving uncertain or contingent future matters. *Id.* (citing Charles Wright & Arthur Miller, *Federal Practice & Procedure,* § 3532, at 238 (1975)).

In the context of court-ordered redistricting, it has been recognized that, although redistricting is primarily the task of the legislature, a controversy is ripe for judicial action when " 'a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.' " *Weiser,* 412 U.S. at 794–95, 93 S.Ct. 2348 (quoting *Reynolds v. Sims,* 377 U.S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)); *see also O'Sullivan v. Brier,* 540 F.Supp. 1200, 1202 (D.Kan. 1982). It has also been articulated that a redistricting controversy is ripe when a court "lack[s] assurance that reapportionment plans [will] be validly enacted" in time for the upcoming election. *Wilson v. Eu,* 1 Cal.4th 707, 4 Cal.Rptr.2d 379, 823 P.2d 545, 547 (1992). Finally, an argument similar to the one presented by the petitioners here was presented to the *Carstens* court, which rejected the ripeness argument:

> In the instant case, the Governor and the State Legislature have had ample opportunity to redistrict Colorado and to provide for an additional representative.... Despite months of deliberate study and negotiation, the people of Colorado still do not have an acceptable congressional redistricting plan. We are persuaded that the fate of redistricting in Colorado has reached an impasse which the parties are not capable of resolving.... Thus, this Court is presented with a controversy of immediate concern. There is no indication that absent judicial intervention, a viable solution will be forthcoming.

*Carstens,* 543 F.Supp. at 76.

Given these principles of ripeness in the context of a redistricting dispute, we conclude that the district court properly determined that the present action was ripe for adjudication. Our review of the record reveals that the district court abstained from ruling on this matter until it was convinced that no legislatively crafted plan would be

forthcoming. That court deferred ruling on the initial motions filed in this case until November 2001, after the general assembly adjourned without adopting a plan. Even after conducting the trial in this case in December 2001, the district court abstained from issuing its decision until January 25, 2002, in order to give the general assembly another chance to promulgate a redistricting plan.[5] In its eventual ruling, the district court explicitly states that it "has waited until this date to announce this decision with the hope that the General Assembly in the general legislative session of January 2002 would have adopted a plan for redistricting and have that plan approved by Governor Owens." *Avalos,* No. 01CV2897, slip op. at 2. The record also indicates that the general assembly had an adequate opportunity to enact a redistricting plan, but failed to do so. Accordingly, we find that the case was ripe for adjudication on its merits. *Carstens,* 543 F.Supp. at 76.

### III. Voting Rights Act

■ Beauprez did not raise an objection below to the plan adopted by the district court based on section 2 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973 (1988). On appeal, Beauprez asserts for the first time that the ARL map adopted by the district court violates section 2 of the VRA.[6] As a

general rule, an issue not presented to or raised at the trial court will not be considered on appeal. *See, e.g., Stevenson v. The Hollywood Bar and Café, Inc.,* 832 P.2d 718, 721 n. 5 (Colo.1992). Thus, Beauprez has failed to preserve his claim that the ARL map adopted by the district court dilutes minority voting strength. Notwithstanding this failure to preserve the claim, we choose to consider whether the ARL map adopted by the district court dilutes minority voting strength in order to make our review of the actions taken by the district court as thorough and complete as the record allows.

■ As stated previously, there are two constitutional requirements that a redistricting plan must meet: population equality and non-dilution of minority voting strength. *Carstens,* 543 F.Supp. at 81–82. Congress enacted the VRA to provide a statutory mechanism for redress of constitutional harms in voting and election procedures against minorities. *See generally Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991); *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Thus, both the constitutional requirement and the statute are based on the same principles and goals.[7] To assert a vote dilution claim in the context of redistricting dispute, a plaintiff must have standing.

---

5. None of the adopted plans was enacted.

6. Section 2 states:

 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elect-

ed to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

7. Although it is unclear from prior precedent whether compliance with the VRA is an additional inquiry that a court must complete before adopting a redistricting plan or whether a VRA inquiry takes the place of a court's inquiry regarding the non-dilution of minority voting strength when determining whether the two constitutional requirements have been met, we need not determine the interplay between the two because the VRA and the constitutional requirement share the same goals and principles. *Compare Abrams v. Johnson,* 521 U.S. 74, 90, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997), and *Carstens,* 543 F.Supp. at 81–82 *with Upham v. Seamon,* 456 U.S. 37, 43, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982), and *Arizonans for Fair Representation v. Symington,* 828 F.Supp. 684, 687 (D.Ariz. 1992).

Standing in this context requires that the plaintiff (1) be a resident of the district in which the alleged dilution occurred, and (2) have been individually harmed by the alleged racial classification utilized in the redistricting plan. *United States v. Hays*, 515 U.S. 737, 745–46, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). Because a vote dilution claim was not raised at trial, the record does not reveal any facts that would confer standing on Beauprez to enable him to assert a section 2 claim.

 Despite our conclusion that Beauprez lacks standing to raise a VRA claim, we choose to address this issue in order to engage in the most thorough review of this case possible. In order to prevail on a claim under section 2, a plaintiff must satisfy three conditions. First, a plaintiff must show that a minority is " 'sufficiently large and geographically compact' " so as to constitute a numerical majority in a district. Second, a plaintiff must show that the minority group is " 'politically cohesive.' " Finally, a plaintiff must show that the " 'white majority votes sufficiently as a bloc to enable … it to defeat the minority's preferred candidate.' " *Growe*, 507 U.S. at 40, 113 S.Ct. 1075 (quoting *Gingles*, 478 U.S. at 51, 106 S.Ct. 2752). The ultimate finding of vote dilution is a question of fact subject to appellate review under the clearly erroneous standard. *Gingles*, 478 U.S. at 78–79, 106 S.Ct. 2752.

Beauprez argues that the ARL map adopted by the district court retrogressed and diluted the minority voting strength of District 1, which consists of the City and County of Denver. Again, because a vote dilution claim was not raised below, the record is inadequate for us to determine whether the three *Gingles* conditions were satisfied. The record does demonstrate, however, that the first *Gingles* condition cannot be satisfied because there is not a large enough Hispanic population in the Denver area to constitute a "majority-minority" district in District 1, regardless of how that district is drawn. With regard to the second and third *Gingles* conditions, the record is inadequate for any conclusion to be reached. We thus find that Beauprez cannot prevail on his VRA claim. *See generally In re Reapportion-*

*ment of the Colo. Gen. Assembly*, 828 P.2d at 193 ("We conclude that resolution of the section 2 claim … would involve the finding of material facts that are in genuine dispute. Our examination of the record discloses that the Commission attempted to apply the proper legal standards to the Voting Rights Act claims … and made a good-faith effort to comply with section 2 of the Act.").

 Although our review of the record leads us to conclude that Beauprez's VRA claim fails because he cannot satisfy the specific requirements of the that statute, we are able to assess his more general constitutional claim of vote dilution, which is separate and apart from his statutory claim. To prevail on a claim that a redistricting plan unconstitutionally dilutes minority voting strength, a claimant must show that the plan unconstitutionally denies the minority group's

chance to effectively influence the political process…. [T]his inquiry focuses on the opportunity of members of the group to participate in party deliberations in the slating and nomination of candidates, their opportunity to register and vote, and hence their chance to directly influence the election returns and to secure the attention of the winning candidate…. [A]n equal protection violation may be found only where the electoral system substantially disadvantages certain voters in their opportunity to influence the political process effectively. In this context such a finding must be supported by evidence of continued frustration of the will of a majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process.

*Davis v. Bandemer*, 478 U.S. 109, 133, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). Because the district court addressed the issue of dilution of minority voting strength repeatedly throughout its order, we can determine from the record that the ARL plan adopted by the district court, particularly with regard to District 1, but also with regard to the entire map, did not result in an unconstitutional dilution of minority voting strength. We review the district court's findings regarding minority vote dilution under the clearly erro-

neous standard of review. *Id.* at 127, 106 S.Ct. 2797; *Karcher v. Daggett,* 462 U.S. 725, 743–44, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). As noted, the district court addressed the constitutional requirement of an absence of vote dilution on nearly every page of its discussion of the ARL map that it adopted. *Avalos,* No. 01CV2897, slip op. at 3–6, 8–9. It increased the percentage of the Hispanic population in three districts, namely Districts 2, 3, and 5. *Id.* at 5, 6, 8. The plan adopted by the district court also comes close to creating a minority "influence district" in the new district, District 7, which contains a 20% Hispanic population. *Id.* at 9. Given these facts, the approximately 3% drop in the Hispanic population of District 1, which the district court acknowledges in its decision, does not give rise to a finding of unconstitutional vote dilution. *Carstens,* 543 F.Supp. at 86 (a 3–4% decrease in Hispanic population was not constitutionally significant in Colorado given the fact that Hispanics cannot reach the 60 to 65% population in a given district necessary to exercise political control of that district). After reviewing the record, we conclude that the finding of the district court that no minority vote dilution occurs in the adopted plan was not clearly erroneous.

### IV. Section 47 of the Colorado Constitution

 Beauprez contends that the district court contravened the legal requirements of Article V, section 47 of the Colorado Constitution when it failed to consider the number of municipalities that are split in its adopted plan and by failing to maintain the western slope community of interest.[8]

Section 47 states:

**Composition of districts** (1) Each district shall be as compact in area as possible and the aggregate linear distance of all district boundaries shall be as short as possible. Each district shall consist of contiguous whole general election precincts. Districts of the same house shall not overlap. (2) Except when necessary to meet the equal

population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts. Within counties whose territory is contained in more than one district of the same house, the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible. When county, city, or town boundaries are changed, adjustments, if any, in legislative districts shall be as prescribed by law. (3) Consistent with the provisions of this section and section 46 of this article, communities of interest, including ethnic, cultural, economic, trade area, geographic, and demographic factors, shall be preserved within a single district wherever possible.

Colo. Const. art. V, § 47. Section 46, expressly referred to in section 47, is entitled "senatorial and representative districts," and addresses only districts of the state general assembly. Colo. Const. art. V, § 46. The creation of districts for the United States House of Representatives, in contrast, is addressed by section 44 of Article V, which is entitled "representatives in congress," and directs that the general assembly shall redistrict the state into congressional districts when a new apportionment of seats is determined by the census. Colo. Const. art. V, § 44. Thus, satisfaction of the factors enumerated in section 47 is not *required* in the adoption of a *congressional* redistricting plan.

 A court engaged in the task of adopting a redistricting plan must initially ensure that the two constitutional requirements of equal population and non-dilution of minority voting strength are satisfied. *Carstens,* 543 F.Supp. at 81–82. Once these constitutional requirements are satisfied, a court may consider non-constitutional criteria that have been articulated by the state as important state policy. *Id.* 82–83. In *Upham v. Seamon,* the United States Supreme Court also expressed this principle:

---

**8.** Beauprez makes no argument that the district court failed to minimize the number of county boundary splits and we do not specifically address this issue. We recently addressed the issue of county boundary splits in the context of state

legislative reapportionment in *In re Reapportionment of the Colorado General Assembly,* No. 01SA386, —— P.3d ——, 2002 WL 100555, 2002 Colo. LEXIS 115 (Colo. Jan. 28, 2002).

Just as a federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution, we hold that a district court should similarly honor state policies in the context of congressional reapportionment.

*Upham v. Seamon,* 456 U.S. 37, 41, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982). In considering whether the district court properly adopted the ARL map consistent with the non-constitutional criteria reflected in section 47, we employ an abuse of discretion standard. *See Connor v. Finch,* 431 U.S. 407, 414, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); *Mahan v. Howell,* 410 U.S. 315, 332, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Williams v. Rhodes,* 393 U.S. 23, 64–65, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (Warren, J., dissenting). A court abuses its discretion "only if it can be said with fair assurance that, 'based on the particular circumstances confronting the court, its decision was manifestly arbitrary, unreasonable, or unfair.' " *State ex rel. Dep't of Corrections v. Pena,* 788 P.2d 143, 148 (Colo. 1990) (Quinn, J., dissenting) (quoting *King v. People,* 785 P.2d 596, 603 (Colo.1990)). Our review of the record leads us to conclude that the district court did not abuse its discretion in applying the non-constitutional criteria.

■ Beauprez specifically contends that the district court did not consider municipalities that were split in its adoption of the ARL map. In contrast, the district court gave ample attention to this issue, stating that it "was very interested in keeping the City of Aurora, the third largest city in Colorado, in one congressional district," but determined that Aurora must be split between District 6 and District 7. *Avalos,* No. 01CV2897, slip op. at 9. The district court also noted that the plan it adopted only split Aurora into two districts, whereas the prior districting plan split it into "three or more" districts. *Id.* Additionally, the district court explained that the City of Arvada should be split into two districts to maintain the community of interest in District 2 that is the

Rocky Flats Coalition of Local Governments. *Id.* at 6, 10. The district court's decision to split these municipalities is thus supported by the record.

■ Beauprez also asserts that the district court improperly failed to preserve the western slope community of interest. There is little dispute that the western slope constitutes a community of interest. *Carstens,* 543 F.Supp. at 91. It is also undisputed that the ARL map adopted by the district court places almost all of the western slope counties into District 3. However, some counties of the western slope are not included in District 3, but are instead included in District 2. This result is supported by the record: The court determined that the San Luis Valley and Huerfano, Pueblo, and Las Animas Counties, as well as a part of Otero County, should be included in a single district, District 3, along with most of the western slope counties in order to preserve the historical Hispanic community of interest in that part of the state. *Avalos,* No. 01CV2897, slip op. at 10. In determining that these counties should be in District 3, the court, pursuant to the constitutional requirement of equal population, necessarily had to remove some counties of the western slope and place them in another district. The district court noted that the counties of the western slope that it placed in District 2, namely Summit, Eagle, and Grand Junction counties, make up a ski corridor from Denver's suburbs and that the growth in these counties "mirrors the Denver metro area more than the Western Slope." *Id.* at 15. The district court thus concluded that these three counties were properly included in District 2. The district court's determination regarding the western slope is thus supported by the record and will not be disturbed by this court on appeal.

V. *The District Court did not Contravene the Constitutional Mandate Regarding the Enactment of Legislation Found in Articles III, IV, and V of the Colorado Constitution.*

■ Finally, Beauprez argues that the district court abused its discretion by disregarding testimony given by Governor Owens.

Specifically, Beauprez contends that the district court should have implemented a plan consistent with Governor Owens's testimony that he would veto any plan that (1) did not keep the City and County of Denver together, (2) did not keep the western slope and the San Luis Valley together, and (3) did not change existing district boundaries as little as possible. Beauprez relies on *Carstens,* which stated that the input of the general assembly and the governor are "integral and indispensable parts of the legislative process," *Carstens,* 543 F.Supp. at 79, to support his contention that the district court should have adopted a plan consistent with Governor Owens's testimony. However, Beauprez misconstrues *Carstens'* holding. A full reading of *Carstens* reveals that that court determined that when no redistricting plan has been enacted through the legislative process, the court "will regard the plans submitted by both the Legislature and the Governor as 'proffered current policy' rather than clear expressions of state policy and will review them in that light." *Carstens,* 543 F.Supp. at 79 (citation omitted). The district court was thus free to accord whatever evidentiary weight it saw fit to the testimony of Governor Owens. The record reveals that the district court considered all of the testimony that it heard, including that of Governor Owens, as well as all of the proposed plans that were submitted for its review. We thus find no abuse of discretion in the district court's consideration of Governor Owens's testimony.

## VI. Conclusion

We find that the district court properly applied the controlling law regarding the adoption of a congressional redistricting plan and thus affirm its adoption of the ARL map. Not only did the district court explain and fairly apply pertinent legal standards, it did so in a highly politically charged atmosphere.

For the reasons explained herein, we issued our order and mandate affirming the decision of the district court on February 26, 2002.