Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 1, 2021

**2021 CO 37**

**No. 21SA146,** *In re Interrogatories on Senate Bill 21-247 Submitted by the Colorado General Assembly*—**Questions Submitted by the Legislature—Apportionment—Separation of Powers.**

The supreme court exercises its original jurisdiction to review interrogatories propounded by the General Assembly regarding the constitutionality of proposed Senate Bill 21-247. The interrogatories ask (1) whether the General Assembly can add and amend various terms to the Colorado Revised Statutes instructing the independent redistricting commissions established under article V, sections 44 to 48.4 of the Colorado Constitution to take certain actions to account for census data delays, and (2) whether the General Assembly can require courts to apply a "substantial compliance" standard in any legal action challenging the redistricting commissions' compliance with the technical, but not substantive, requirements of article V, sections 44 to 48.4.

The supreme court answers both interrogatories in the negative. First, while nothing in the constitution forbids the commissions from taking the actions suggested by Senate Bill 21-247, the independent commissions were established

by voters specifically to remove authority from the General Assembly over the redistricting process. Thus, the General Assembly does not have the authority to direct the independent commissions to interpret constitutional terms a certain way or to take any action beyond what article V, sections 44 to 48.4 already require. Second, the General Assembly does not have the authority to define the standard that applies to constitutional challenges; that power lies within the sole province of the judiciary. Accordingly, the supreme court concludes that Senate Bill 21-247 would be unconstitutional if enacted.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

---

**2021 CO 37**

---

**Supreme Court Case No. 21SA146**
*Original Proceeding Pursuant to Article VI, Section 3 of the*
*Constitution of the State of Colorado*

---

**In Re: Interrogatories on Senate Bill 21-247 Submitted by the Colorado General Assembly**

---

**General Assembly's Interrogatories Answered**
*en banc*
June 1, 2021

---

**Attorneys for the Colorado General Assembly:**
Westfall Law, LLC
Richard A. Westfall
        *Denver, Colorado*

**Attorneys for the Governor and Attorney General:**
Philip J. Weiser, Attorney General
Natalie Hanlon Leh, Chief Deputy Attorney General
Eric R. Olson, Solicitor General
Kurtis T. Morrison, Deputy Attorney General
Michael McMaster, Assistant Solicitor General
Lauren Davison, Assistant Attorney General
        *Denver, Colorado*

**Attorneys for the Colorado Secretary of State:**
Philip J. Weiser, Attorney General
Leeann Morrill, First Assistant Attorney General
Grant T. Sullivan, Assistant Solicitor General
Peter G. Baumann, Campaign Finance Enforcement Fellow
        *Denver, Colorado*

**Attorneys for Colorado Independent Congressional Redistricting Commission:**
Wheeler Trigg O'Donnell LLP
Frederick R. Yarger
Meghan Frei Berglind
*Denver, Colorado*

Achieve Law Group
Jerome DeHerrera
Luis A. Corchado
*Denver, Colorado*

**Attorneys for Colorado Independent Legislative Redistricting Commission:**
Law Office of Richard C. Kaufman PC, Inc.
Richard Kaufman
*Centennial, Colorado*

Peters Schulte Odil & Wallshein LLC
Timothy R. Odil
*Loveland, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.

**JUSTICE HOOD** dissents, and **JUSTICE GABRIEL** joins in the dissent.

¶1     For the last several decades, Colorado's decennial redistricting process has been a tumultuous, politically fraught, and notoriously litigious affair.[1]  Seeking a new approach, Colorado voters in 2018 passed Amendments Y and Z, amendments to the state constitution that vest the authority to draw congressional and legislative districts with new, independent commissions made up of ordinary voters.  Colo. Const. art. V, §§ 44 to 48.4.  The Amendments lay out instructions for how the commissions should draw district maps, including criteria to be considered in determining boundaries and detailed timetables that require public feedback and judicial review of the final plans.

¶2     The cascading deadlines set out in Amendments Y and Z were based on a crucial assumption: that the United States Census Bureau would release its decennial census data in a timely fashion, as required by federal law.  Delays caused by the ongoing COVID-19 pandemic, however, mean that the Census Bureau is operating months behind schedule this year and has yet to release crucial

---

[1] *See, e.g.*, *Lucas v. Forty-Fourth Gen. Assembly of State of Colo.*, 377 U.S. 713 (1964); *Carstens v. Lamm*, 543 F. Supp. 68 (D. Colo. 1982); *Beauprez v. Avalos*, 42 P.3d 642 (Colo. 2002); *People ex rel. Salazar v. Davidson*, 79 P.3d 1221 (Colo. 2003); *Keller v. Davidson*, 299 F. Supp. 2d 1171 (D. Colo. 2004); *Lance v. Davidson*, 379 F. Supp. 2d 1117 (D. Colo. 2005), *vacated and remanded by Lance v. Dennis*, 546 U.S. 459 (2006); *Lance v. Dennis*, 444 F. Supp. 2d 1149 (D. Colo. 2006), *vacated and remanded by Lance v. Coffman*, 549 U.S. 437 (2007); *Lance v. Coffman*, No. 03-cv-02452, 2007 WL 915497 (D. Colo. Mar. 23, 2007); *Hall v. Moreno*, 2012 CO 14, 270 P.3d 961.

redistricting data to which the redistricting commissions expected to already have access. This delay has thrown into question the feasibility of complying with the timelines established by Amendments Y and Z.

¶3 To address the resulting uncertainty, the General Assembly introduced Senate Bill 21-247 ("SB 21-247"). Among other things, the bill would amend a recently enacted statutory definition of "necessary census data" to allow the commissions' work to move forward based on preliminary census data and any other state or federal demographic data the commissions see fit to consult. The bill would also require the final plans submitted to this court for review to be based on the more complete redistricting data that the Census Bureau is expected to release later this year and would require the commissions to hold an additional public hearing after that data is incorporated into the plans. Finally, the bill would require a reviewing court to apply a "substantial compliance" standard to any legal challenges that may be brought alleging a failure to comply with the technical—but not substantive—requirements of Amendments Y and Z.

¶4 Recognizing that there are important questions as to the constitutionality of SB 21-247, the General Assembly petitioned this court to exercise its original jurisdiction under article VI, section 3 of the Colorado Constitution to answer the following interrogatories:

1. Are the provisions of Senate Bill 21-247, which amend the statutory definition of "necessary census data," establish statutory

authority for nonpartisan staff to use that data for the preliminary plans, and confirm in statute that the staff plans which provide the basis for action by the commission must be based on final census data, constitutional in allowing the commissions to perform their constitutional responsibilities in accordance with sections 44 to 48.4 of article V of the state constitution following the 2020 federal census?

2. Is the provision of Senate Bill 21-247 that directs a court to apply the standard of substantial compliance when adjudicating a legal proceeding that challenges the lack of compliance with the technical requirements for the redistricting process established in the state constitution and related statutes, such as the timing of this court's review of a commission's first approved map or a staff map when the commission is unable to adopt a plan by the deadline to do so, constitutional?

¶5 We accepted jurisdiction and now answer both questions in the negative. Amendments Y and Z do not require the exclusive use of final census data as the commissions and their nonpartisan staff begin their work. The commissions are thus free to consult other reliable sources of population data, such as preliminary census data and interim data from the Census Bureau's American Community Survey.

¶6 However, the General Assembly does not have the power to *compel* the independent commissions or their nonpartisan staff to consider a particular source of population data or take any action beyond what Amendments Y and Z already require. The Amendments were expressly intended to remove the General Assembly from the redistricting process, instead vesting all authority to draw district maps with independent commissions. Under this new scheme, the

6

General Assembly has a discrete and limited role in appropriating funds for the commissions and nominating a limited number of applicants for consideration as commission members. *See* Colo. Const. art. V, §§ 44.1, 44.2, 47, 48. But nothing in the Amendments authorizes the General Assembly to enact implementing legislation or take actions that would otherwise curtail the commissions' constitutionally mandated independence. Accordingly, insofar as SB 21-247 attempts to direct the actions of the commissions and their nonpartisan staff, it would be unconstitutional if enacted.

¶7 The General Assembly likewise lacks the inherent power to dictate what standard a court should apply when determining compliance with the technical provisions of Amendments Y and Z; that task lies within the sole province of the courts. Thus, while this court could certainly adopt such a standard, the provision of SB 21-247 directing courts to apply a "substantial compliance" standard to these constitutional provisions would be unconstitutional if enacted.

¶8 In so answering, we do not mean to suggest that the General Assembly had any nefarious intent in proposing SB 21-247. The legislation was the product of broad, bipartisan support and by all accounts appears to be a well-intentioned attempt to help the redistricting commissions handle the unforeseen delay in the release of census data. But however benign the General Assembly's motives may be, upholding the General Assembly's incursion into the domains of both the

7

independent redistricting commissions and the judiciary here would set a troubling precedent and run contrary to voter intent in enacting Amendments Y and Z as well as our constitutional system of separation of powers. Accordingly, we answer both of the General Assembly's interrogatories in the negative.

## I. Background

### A. Colorado's Redistricting History

¶9 Redistricting "has had a checkered history in Colorado." *People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1225 (Colo. 2003). Our original 1876 constitution vested the General Assembly with authority to create both congressional and legislative districts. *See* Colo. Const. art. V, § 44 (1876) ("When a new apportionment shall be made by Congress the General Assembly shall divide the State into Congressional districts accordingly."); *id.* § 47 ("Senatorial and Representative districts may be altered from time to time, as public convenience may require."). However, for years, the General Assembly failed to redistrict even after the population had grown and the state had received additional congressional seats, resulting in "grossly disproportionate" districts in which "urban areas were systematically underrepresented." *Salazar*, 79 P.3d at 1225–26.

¶10 This state of affairs ended after the U.S. Supreme Court ordered Colorado to comply with the "one-person, one vote" principle. *See Lucas v. Forty-Fourth Gen. Assembly of State of Colo.*, 377 U.S. 713, 739 (1964). *Lucas* "ushered in a new era,"

8

after which it became clear that the state "must redistrict both its legislative and congressional seats after every new census." *Salazar*, 79 P.3d at 1226.

¶11 Two years after the announcement of *Lucas*, the voters of Colorado passed an initiative vesting the power to conduct legislative redistricting for state House and Senate districts in a commission made up of members of the legislative, executive, and judicial departments. *See* Colo. Const. art. V, § 48 (1967). The authority to draw congressional district boundaries, however, remained in the hands of the General Assembly. And while the constitution provided the legislative redistricting commission with procedural steps and substantive criteria to guide its redistricting process, *see* Colo. Const. art. V, §§ 46, 47 (2017), the General Assembly was simply instructed to "divide the state into as many congressional districts as there are representatives in congress apportioned to this state by the congress of the United States for the election of one representative to congress from each district," *id.* § 44 (2017).

¶12 Notwithstanding this broad grant of authority, the General Assembly failed to produce a constitutional redistricting plan in three of the last four redistricting cycles. *See Hall v. Moreno*, 2012 CO 14, ¶ 4, 270 P.3d 961, 964; *Beauprez v. Avalos*, 42 P.3d 642, 645–46 (Colo. 2002); *Carstens v. Lamm*, 543 F. Supp. 68, 71–72 (D. Colo. 1982). Thus, our courts were repeatedly visited by the "unwelcome obligation" of judicial redistricting, *Hall*, ¶ 2, 270 P.3d at 963 (quoting *Connor v. Finch*, 431 U.S.

407, 415 (1977)), which "forces the apolitical judiciary to engage in an inherently political undertaking," *id.* at ¶ 5, 270 P.3d at 964.

## B. Amendments Y and Z

¶13    All of this changed in 2018.  That year, pursuant to article XIX, section 2 of the Colorado Constitution, a unanimous General Assembly submitted two referred measures to the voters proposing constitutional amendments that would remove the redistricting authority from the General Assembly and the tri-branch commission and place it, instead, in the hands of the new Independent Congressional Redistricting Commission and the Independent Legislative Redistricting Commission, both made up of ordinary voters.[2]  *See* SCR 18-004, SCR 18-005; *see also* Chris Bianchi, *Bye, Bye, Gerrymandering? Inside Amendments Y and Z*, Westword (Oct. 15, 2018), https://www.westword.com/news/inside-amendments-y-and-z-which-try-to-eliminate-gerrymandering-in-colorado-10885833.    The Amendments, which were listed on voters' ballots as Amendments Y and Z, were designed to:

---

[2] The "Elections Clause" of the U.S. Constitution provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof."  U.S. Const. art. I, § 4, cl. 1.  The U.S. Supreme Court has clarified that, where a state's "lawmaking power . . . includes the initiative process," the Elections Clause permits the vesting of redistricting power with independent commissions created by voter initiative.  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 793 (2015).

- create [independent redistricting commissions], consisting of an equal number of members from each of the state's two largest political parties and unaffiliated voters, to amend and approve . . . district maps drawn by nonpartisan legislative staff;

- establish a process for selecting commissioners, new requirements for transparency and ethics, and a procedure for judicial review of commission maps; and

- establish and prioritize the criteria the commission[s] must use for adopting the state's U.S. congressional district [and state legislative district] map[s].

Legis. Council, Colo. Gen. Assembly, Rsch. Pub. No. 702-2, *2018 State Ballot Information Booklet* 8 (2018) (the "Blue Book"); *see also id.* at 23 (substantially similar description for Amendment Z). Both the "Arguments For" and "Arguments Against" the measures in the Blue Book highlighted the fact that the Amendments sought to "transfer[] the legislature's role [in the redistricting process] to . . . independent commission[s]." *Id.* at 10; *see also id.* at 11 (arguing that, because it would put the redistricting power in the hands of "unelected commissioners," rather than "state legislators," Amendment Y "takes accountability out of the redistricting process"); *id.* at 25 (noting approvingly that Amendment Z "keep[s] political parties and politicians . . . from controlling the redistricting process"); *id.* at 26 (arguing that Amendment Z "reduces accountability" because commissions "are not even accountable to elected officials"). In short, Amendments Y and Z sought to limit the influence of partisan politics over redistricting and make the process more transparent and inclusive. Voters approved both measures by

11

overwhelming margins. *See* Colo. Sec'y of State, *2018 Abstract of Votes Cast* 67, 69 (2018), https://www.sos.state.co.us/pubs/elections/Results/2018/ 2018GeneralCertAndResults.pdf [https://perma.cc/WXC5-3JPV].

¶14 Now codified as article V, sections 44 to 48.4 of the Colorado Constitution,[3] Amendments Y and Z set out substantive criteria for the redistricting maps, requiring, among other things, that the final maps represent "a good-faith effort" to achieve "population equality between districts," *id.* §§ 44.3(1)(a), 48.1(1)(a); preserve "communities of interest" as much as is reasonably possible, *id.* §§ 44.3(2)(a), 48.1(2)(a); maximize politically competitive districts, *id.* §§ 44.3(3)(a), 48.1(3)(a); not be drawn for the purpose of protecting any political party or candidate, *id.* §§ 44.3(4)(a), 48.1(4)(a); and not "dilut[e] the impact of [any] racial or language minority group's electoral influence," *id.* §§ 44.3(4)(b), 48.1(4)(b).

¶15 In addition to these substantive criteria, the Amendments provide detailed instructions for the selection, composition, and operation of the independent commissions. The two commissions—one tasked with dividing the state into

---

[3] Amendment Y, which is concerned with the congressional redistricting commission, is codified as article V, sections 44 to 44.6. Amendment Z, which is concerned with the state legislative redistricting commission, is codified as article V, sections 45 to 48.4. Because the Amendments are nearly identical in both content and structure, we discuss their provisions together throughout, noting differences between the two where appropriate.

federal congressional districts and the other tasked with dividing the state into legislative districts for the state House of Representatives and Senate—are each composed of twelve voters, selected and appointed according to the criteria laid out in article V, sections 44.1 and 47, respectively. The commissions are assisted by nonpartisan staff appointed by the director of research of the Legislative Council and the director of the Office of Legislative Legal Services, nonpartisan offices within the General Assembly. *See id.* §§ 44.2(1)(b), 48(1)(b). The commissions are free to adopt their own rules governing administration and operation, *id.* §§ 44.2(1)(e), 48(1)(e), but must follow certain constitutionally mandated procedures relating to public involvement in the redistricting process, *id.* §§ 44.2(3), 48(3), and submission of the final plan to this court for review, *id.* §§ 44.2(2), 48(2). The commissioners and nonpartisan staff are also bound by ethical requirements designed to "ensure transparency in the redistricting process." *Id.* §§ 44.2(4), 48(4).

¶16 Finally, and pertinent here, Amendments Y and Z set out a detailed timeline for the redistricting process, with benchmarks and deadlines for the commissions,

13

their nonpartisan staff, and this court.[4] The process begins in March of the redistricting year when the Governor convenes the commissions. *See id.* § 44.2(1)(a) (congressional restricting commission must convene no later than March 15); *id.* § 48(1)(a) (legislative redistricting commission must convene no later than March 30). Once nonpartisan staff are appointed, they begin by creating a "preliminary plan" for consideration by each of the commissions. *See id.* §§ 44.4(1), 48.2(1). These plans must be presented and published "no earlier than thirty days and no later than forty-five days after the commission[s] ha[ve] convened or the *necessary census data* are available, whichever is later." *Id.* (emphasis added). Notably, for our purposes, the term "necessary census data" is not defined anywhere within Amendments Y or Z.[5]

¶17 After preliminary plans are published, the commissions must hold hearings on the plans throughout the state, *id.* §§ 44.2(3), 48(3), which must conclude no later than July 7, *id.* § 44.4(2); *id.* § 48.2(2) (July 21 for the legislative commission). Following the conclusion of these public hearings, the nonpartisan staff must

---

[4] For the sake of simplicity, we primarily refer to the deadlines for the congressional redistricting commission, noting parenthetically when those deadlines differ for the legislative redistricting commission.

[5] The term "necessary census data" appears to have been carried over from a previous version of article V, section 48, governing the operation of the earlier tri-branch reapportionment commission. *See* Colo. Const. art. V, § 48(1)(e) (2017).

prepare, present, and publish at least three "staff plans" in accordance with a timetable established by their respective commission. *See id.* §§ 44.4(3), 48.2(3). Any time after the first staff plan is presented, but no later than September 1, the commissions must adopt one of the staff plans as the "final plan," which must then be submitted to this court for review. *Id.* § 44.4(5); *id.* § 48.2(5) (September 15 for the legislative commission).[6] If, for any reason, one of the commissions fails to adopt a final plan by the September deadline, the nonpartisan staff must submit an unamended version of their third staff plan to this court for review. *Id.* §§ 44.4(6), 48.2(6).[7]

¶18     Once a final plan has been submitted to this court, we must determine whether the plan complies with the criteria set out in article V, sections 44.3 and 48.1. *See id.* §§ 44.5(1), 48.3(1). By November 1, this court must approve the plan unless we find that the commission—or, if the commission failed to timely submit a final plan, the nonpartisan staff—abused its discretion in applying or failing to

---

[6] If one of the commissions decides on a final plan before the nonpartisan staff has completed all three staff plans, the nonpartisan staff is not required to produce additional staff plans for that commission. *Id.* §§ 44.4(5)(a), 48.2(5)(a).

[7] The commissions may adjust the deadlines for the preliminary and staff plans if "conditions outside of the commission's control require such an adjustment to ensure adopting a final plan" by the September deadline. *Id.* §§ 44.4(5)(c), 48.2(5)(c).

15

apply the specified criteria. *Id.* § 44.5(2), (4)(a); *id.* § 48.3(2), (4)(a) (November 15 for the legislative commission). If this court finds an abuse of discretion and rejects the submitted plan, the commission has twelve days to hold hearings and adopt a new plan that resolves any defects in the original plan. *Id.* §§ 44.5(4)(b), 48.3(4)(b).[8] By no later than December 15, this court must approve "a plan"—be it the first revised plan or a subsequent revised plan, if necessary—and order that the plan be filed with the Secretary of State. *Id.* § 44.5(5); *id.* § 48.3(5) (December 29 for the legislative redistricting plan).

## C. Census Data Delays

¶19 The redistricting process, both before and after the adoption of Amendments Y and Z, has always hinged on population data drawn from the decennial census. The U.S. Constitution requires that the federal government conduct a census every ten years. *See* U.S. Const. art. I, § 2, cl. 3. To fulfill this obligation, federal law tasks the United States Census Bureau with taking a "census of population as of the first day of April" once every ten years. 13 U.S.C. § 141(a) (2018). By December 31 of the census year, the Census Bureau must report a tabulation of the total population by state—commonly referred to as

---

[8] If the commission fails to adopt a new plan within twelve days, the nonpartisan staff is given an additional three days to formulate a new plan to submit to this court to review. *Id.* §§ 44.5(4)(c), 48.3(4)(c).

"apportionment data"—to be used in determining how many representatives in Congress will be apportioned to each state. *Id.* § 141(b). Then, by the following April 1, the Census Bureau must release to the states more detailed redistricting data—often referred to as "Pub. L. 94-171 data"—to be used in drawing congressional district maps. *Id.* § 141(c).

¶20 As with many things, the ongoing COVID-19 pandemic threw a wrench in this process, delaying data collection and processing for the 2020 census. As a result, the apportionment data that should have been reported by December 31, 2020, was not released until April 26, 2021. *See 2020 Census Apportionment Results Delivered to the President*, U.S. Census Bureau (Apr. 26, 2021), https://www.census.gov/newsroom/press-releases/2021/2020-census-apportionment-results.html [https://perma.cc/NZQ2-MZUF]. The figures released on April 26 show that Colorado will gain an additional, eighth seat in the U.S. House of Representatives starting with the 2022 election due to the state's population growth since the 2010 census. *Id.* However, the Pub. L. 94-171 data that normally would be used to draw new district maps will not be delivered until August 16, 2021, more than four months after the April 1, 2021 deadline contemplated by federal law. *Id.* But even this data may be of limited use: The Census Bureau will be releasing data in a "legacy format" in August—that is, raw data in an older format without tables or a user-friendly system for data access.

17

*See U.S. Census Bureau Statement on Release of Legacy Format Summary Redistricting Data File*, U.S. Census Bureau (Mar. 15, 2021), https://www.census.gov/newsroom/press-releases/2021/statement-legacy-format-redistricting.html [https://perma.cc/5YGF-5F5A].[9]  States will likely have to wait until September 30, 2021 to access tabulated, user-friendly redistricting data.  *Id.*

¶21    The timelines set out in Amendments Y and Z were designed to align with the release of data from the federal decennial census.  *See, e.g.*, Colo. Const. art. V, §§ 44.1(1), 47(1) ("*After each federal decennial census* of the United States, the members of the commission shall be appointed and convened as prescribed in this section." (emphasis added)).  But the delay of the 2020 census data makes it difficult for the commissions to both make use of the up-to-date census data and submit plans within the constitutionally mandated timelines.  Tabulated data may not be released until September 30, past the deadlines for submission of final plans to this court.  And even assuming the commissions are able to use the legacy format data released on August 16, they will have only a few weeks after that to

_____

[9] The Census Bureau acknowledges that "most states lack the capacity or resources to tabulate the data from these summary files on their own," but nevertheless decided to release legacy format data earlier to give states the opportunity to use an outside vendor to process the data for a quicker turnaround.  *Id.*

incorporate that data, receive public input, and submit final plans to this court.[10] Any delay in the submission and approval of final maps could derail a host of other deadlines that must be met before the 2022 elections. *See generally* Colo. Sec'y of State, *2022 Election Calendar* (2021), https://www.sos.state.co.us/pubs/ elections/calendars/2022ElectionCalendar.pdf [https://perma.cc/YHG2-M2KZ] (listing deadlines for the 2022 election calendar).

### D. SB 21-247

¶22 To address the impact of delayed census data on the redistricting process, members of the General Assembly proposed SB 21-247. The bill seeks to address the delay in two ways. First, the bill would amend and supplement various provisions of the recently enacted section 2-2-902, C.R.S. (2020).[11] The statutory definition of "necessary census data" in section 2-2-902 would be amended to include, for the 2021 redistricting year only, population estimates from the census

---

[10] Despite these setbacks, the commissions have done an admirable job of setting about their constitutionally mandated tasks, holding dozens of meetings and conducting public outreach. *See generally* Colorado Independent Redistricting Commission, https://redistricting.colorado.gov [https://perma.cc/PC53-5UFB]. Counsel for both commissions assured this court at oral argument that the commissions are endeavoring to create and submit constitutionally compliant plans by their respective September final-plan deadlines.

[11] Section 2-2-902 was added to the Colorado revised statutes last year following the enactment of the "Colorado Accurate Residence for Redistricting Act." *See* ch. 38, sec. 1, § 2-2-902, 2020 Colo. Sess. Laws 122, 122.

apportionment data as well as other non-census sources. And a new statutory term, "final census data," would be added and defined to include, for the 2021 redistricting year only, both the legacy and tabulated Pub. L. 94-171 data. The amended provisions of section 2-2-902 further instruct the commissions and their nonpartisan staff as to how and when to release plans using final census data, including a new requirement that the commissions hold at least one public hearing after receiving final census data.

¶23 Second, SB 21-247 adds a new section to the Colorado Revised Statutes, section 2-2-903, which would require a reviewing court to apply a "substantial compliance" standard to the technical provisions of the Amendments:

> In any legal proceeding challenging compliance by the commissions, the Colorado Supreme Court, or nonpartisan staff with the technical rather than substantive provisions that implement the redistricting processes established in the Colorado constitution and related statutes, a court shall adjudicate such dispute with a view to ascertaining whether there was *substantial compliance* with the requirements of such constitutional or statutory provisions.

(Emphasis added.)

¶24 SB 21-247 was introduced in the Senate on April 16, 2021, and was passed on third reading on April 26, 2021. The bill was passed by the House of Representatives on second reading on May 4, 2021, and currently awaits final passage by the House of Representatives. Recognizing that the bill raises a number of novel questions as to the interpretation of Amendments Y and Z and the

20

operation of the newly formed independent redistricting commissions, the General Assembly petitioned this court to answer interrogatories before passing the final bill. We accepted the petition and now exercise our jurisdiction to answer the questions posed by the General Assembly.

## II. Jurisdiction

¶25 Under our state constitution "[t]he supreme court shall give its opinion upon important questions upon solemn occasions when required by the governor, the senate, or the house of representatives." Colo. Const. art. VI, § 3.[12] It is the sole province of this court to decide whether a question is sufficiently "important" and arises from an appropriately "solemn occasion" so as to justify the exercise of our original jurisdiction under article VI, section 3. *In re Interrogatory on House Joint Resol. 20-1006*, 2020 CO 23, ¶ 26, __ P.3d __. And while it may be "'impossible to state any absolute rule' for determining the importance and solemnity of a given

---

[12] Colorado is one of only eight states in which the supreme court is constitutionally authorized to issue advisory opinions on questions presented to it by the governor or the legislature. *In re Hickenlooper*, 2013 CO 62, ¶ 35, 312 P.3d 153, 160 (Márquez, J., dissenting). The other seven states are Florida, Maine, Massachusetts, Michigan, New Hampshire, Rhode Island, and South Dakota. *See* Me. Const. art. VI, § 3; Mass. Const. pt. 2, ch. 3, art. 2; Mich. Const. art. 3, § 8; N.H. Const. pt. 2, art. 74; R.I. Const. art. 10, § 3; *see also* Fla. Const. art. 4, § 1(c) (advisory opinions can only be requested by the governor, not the legislature); S.D. Const. art. V, § 5 (same). Additionally, two states have statutory provisions allowing advisory opinions. *See* Ala. Code § 12-2-10 (2021); Del. Code Ann. tit. 10, § 141 (2021).

question," this court's past decisions provide a few broad guidelines to help us in making that determination. *Id.* (quoting *In re Hickenlooper*, 2013 CO 62, ¶ 7, 312 P.3d 153, 156).

¶26 First, we have held that questions posed by the legislature "must be connected with pending legislation and must concern either the constitutionality of the legislation or matters connected to the constitutionality of the legislation concerning purely public rights." *In re Submission of Interrogatories on House Bill 99-1325*, 979 P.2d 549, 554 (Colo. 1999). In keeping with this limitation, we generally avoid answering "questions affecting private or corporate rights" through the interrogatory process. *In re Lieutenant Governorship*, 129 P. 811, 814 (Colo. 1913).

¶27 Second, we generally decline to answer questions "that call for 'hasty consideration' rather than the thorough analysis the interrogatories require." *In re Interrogatory on House Joint Resol. 20-1006*, ¶ 27 (quoting *In re House Bill No. 1503 of Forty-Sixth Gen. Assembly*, 428 P.2d 75, 77 (Colo. 1967)). To this end, we favor accepting jurisdiction over interrogatories that present "narrow question[s]" that "principally requir[e] us to construe" legal provisions, as opposed to questions that require "underlying factual determinations." *In re Interrogatory on House Bill 21-1164*, 2021 CO 34, ¶¶ 26, 29, __ P.3d __.

22

¶28 Finally, we have declined in the past to answer questions that can be addressed "through ordinary judicial proceedings." *In re Senate Resol. Relating to Senate Bill No. 65*, 21 P. 478, 480 (Colo. 1889).

¶29 We conclude that the interrogatories before us present important questions upon a solemn occasion. The work of the independent redistricting commissions is a matter of "great public importance involving the fundamental rights of Colorado citizens to vote for their representatives." *Salazar*, 79 P.3d at 1224. The purely legal questions presented deal with concrete issues affecting these fundamental public rights, and thus may be appropriately reviewed through the interrogatory process. And given that article V, sections 44.5 and 48.3 task this court with reviewing and approving the commissions' final plans, there is no alternative or "ordinary" judicial process through which these questions can be readily addressed—it is ultimately the responsibility of this court to ensure compliance with the processes and standards set out in Amendments Y and Z.[13]

---

[13] The congressional redistricting commission has urged this court to decline answering the second interrogatory on the grounds that the question is unripe. But we have never before applied the justiciability doctrine of ripeness to petitions invoking our advisory power pursuant to article VI, section 3 of the Colorado Constitution. None of the cases cited by the commission suggest otherwise; instead, they represent instances in which this court declined to answer interrogatories due to unresolved issues of fact. *See, e.g.*, *In re Interrogatories of Colo. Senate of Fifty-First Gen. Assembly, Senate Resol. No. 5*, 578 P.2d 216, 217 (Colo. 1978)

23

Accordingly, we exercise our original jurisdiction and answer the interrogatories presented by the General Assembly.

### III. Standard of Review

¶30 When construing a constitutional amendment, we seek to determine and effectuate the will of the voters in adopting the measure. *In re Interrogatory on House Bill 21-1164*, ¶ 31. To accomplish this, we begin with the plain language of the provision, giving terms their ordinary meanings. *Id.* We may also "consider other relevant materials such as the 'Blue Book,' an analysis of ballot proposals prepared by the Legislative Council." *Lobato v. State*, 218 P.3d 358, 375 (Colo. 2009). We endeavor to avoid a "narrow or technical reading of language contained in an initiated constitutional amendment if to do such would defeat the intent of the people." *Zaner v. City of Brighton*, 917 P.2d 280, 283 (Colo. 1996). And whenever possible, we seek to avoid interpretations that would produce absurd or unreasonable results. *In re Interrogatory on House Bill 21-1164*, ¶ 31.

¶31 When interpreting a statute, we generally begin with the presumption that the act is "constitutional, and a party asserting that a statute is unconstitutional has the burden of proving that assertion beyond a reasonable doubt." *Zaner*,

(noting that an interrogatory could not be answered "in the absence of resolution of . . . issues of fact"). No such resolution of factual issues is necessary to answer the second interrogatory presented.

917 P.2d at 286. However, "[n]o such presumption of constitutionality arises when we are asked by the General Assembly to address the constitutionality of legislation that has not yet been passed by both houses of the General Assembly." *Submission of Interrogatories on Senate Bill 93-74*, 852 P.2d 1, 5 n.4 (Colo. 1993).

¶32 In examining the interaction between a challenged statute and a constitutional amendment, our inquiry focuses on whether the two provisions necessarily conflict. *See In re Interrogatories Propounded by Senate Concerning House Bill 1078*, 536 P.2d 308, 313 (Colo. 1975) ("The test for the existence of a conflict is: Does one authorize what the other forbids or forbid what the other authorizes?"). Thus, we have held that "legislation that furthers the purpose of . . . constitutional provisions or facilitates their enforcement is permissible." *Zaner*, 917 P.2d at 286. By contrast, "legislation which directly or indirectly impairs, limits or destroys rights granted by . . . constitutional provisions is not permissible." *Id.*

## IV. Analysis

¶33 We begin by reviewing what is and isn't required of redistricting plans under Amendments Y and Z, ultimately concluding that the Amendments do not require the exclusive use of final census data when creating preliminary and staff plans. *See* Colo. Const. art. V §§ 44.4, 48.2. The commissions and their nonpartisan staff are thus free to consult other reliable sources of population data, such as the preliminary census data released on April 26 and interim data from the Census

25

Bureau's American Community Survey, so long as the resulting final plans submitted to this court for review conform with the criteria set out in article V, sections 44.3 and 48.1.

¶34 We next determine that, in light of the commissions' independent constitutional authority and purposefully independent design, coupled with the limited role carved out for the legislature, the General Assembly does not have the authority to compel the commissions or their nonpartisan staff to take any action beyond what Amendments Y and Z already require. Thus, to the extent that SB 21-247 attempts to direct the actions of the commissions and their nonpartisan staff, it would be unconstitutional if enacted.

¶35 Finally, we conclude that the General Assembly lacks the authority to dictate the standard a court should apply when reviewing compliance with constitutional provisions such as those found in Amendments Y and Z. Accordingly, the portion of SB 21-247 that would require a reviewing court to apply a "substantial compliance" standard for compliance with the technical provisions of Amendments Y and Z would be unconstitutional if enacted.

### A. Amendments Y and Z Do Not Require the Exclusive Use of Final Census Data in Creating Preliminary and Staff Plans

¶36 As described above, Amendments Y and Z lay out admirably detailed guidelines for the operation of the commissions as well as criteria related to the

26

substantive requirements that the final redistricting plans must meet. None of these guidelines or criteria, however, require that the commissions refer wholly or exclusively to Pub. L. 94-171 data produced by the Census Bureau. Indeed, some other types of data and testimony presumably *must* be heard by the commissions to determine the existence of and relevant boundaries for different "communities of interest." *See* Colo. Const. art. V, §§ 44.3(2)(a), 48.1(2)(a) (requiring that the final plans "preserve whole communities of interest" to the extent possible); *id.* §§ 44(3)(b)(I), 46(3)(b)(I) (defining "community of interest" as any group that "shares one or more substantial interests that may be the subject of . . . legislative action" and "is composed of a reasonably proximate population"). The same is likely true for evidence necessary to "maximize the number of politically competitive districts." *See id.* §§ 44.3(3)(a), 48.1(3)(a).

¶37    The phrase "census data" is mentioned only once in each Amendment, and then only in reference to a deadline for preliminary plans. *See id.* §§ 44.4(1), 48.2(1) (requiring preliminary plans to be "presented and published no earlier than thirty days and no later than forty-five days after the commission has convened *or the necessary census data are available, whichever is later*" (emphasis added)). Moreover, this particular deadline is not carved in stone—each commission has the power to adjust the date "if conditions outside of the commission's control require such an adjustment." *Id.* §§ 44.4(5)(c), 48.2(5)(c). Thus, the phrase "necessary census data"

operates not as a substantive requirement for the final plans, but rather as a shorthand to tie the redistricting timeline to the April 1 date by which federal law demands that the Census Bureau release Pub. L. 94-171 data. *See* 13 U.S.C. § 141(c).

¶38 Finally, reading the phrase "necessary census data" to establish a requirement that the commissions consider only Pub. L. 94-171 data would defeat the intent of the voters who adopted Amendments Y and Z. Viewing the Amendments as a whole, the preliminary and staff plans serve two primary purposes. First, they serve as "rough drafts" for the final plans, giving the commissions starting points from which to work. Second, and more importantly, release of the preliminary and staff plans allows for public input into the redistricting process. *See, e.g.*, Colo. Const. art. V, §§ 44.4(1), 48.2(1) (allowing any member of the public to submit comments on the preliminary plans and requiring nonpartisan staff to explain how they intend to address those comments). Imposing a requirement that the commissions wait to create such plans until Pub. L. 94-171 data is available would limit the opportunity for public input and make it harder for the public "to be heard as redistricting maps are drawn." *Id.* §§ 44(1)(f), 46(1)(f).

¶39 To be sure, in a normal year, it would be preferable for the preliminary and staff plans to be based on the detailed Pub. L. 94-171 data timely provided by the

Census Bureau. But the text of Amendments Y and Z does not require the exclusive use of such data in the creation of those plans, and we decline to read such a requirement into the Amendments when doing so would frustrate the intent of the voters and produce absurd results in light of this year's census data delays.[14]

## B. The General Assembly Cannot Assert Control Over the Independent Commissions or Their Nonpartisan Staff

¶40 SB 21-247 seeks to direct the actions of the redistricting commissions and their nonpartisan staff by demanding, for example, that they "shall" use Pub. L. 94-171 data to prepare staff plans and "shall" conduct an additional hearing after taking account of such data. Less explicitly, the bill seeks to direct the actions of the commissions by defining the phrases "necessary census data" and "final census data." We conclude, however, that the General Assembly lacks the authority to direct the actions or operation of the redistricting commissions and their nonpartisan staff.

---

[14] The final plans that the commissions submit to this court must be the result of "a good-faith effort to achieve . . . population equality between districts . . . as required by the constitution of the United States." *Id.* § 44.3(1)(a); *see also id.* § 48.1(1)(a) (requiring that, for legislative districts, there be no more than "five percent deviation between the most populous and the least populous district in each house"). Counsel for both commissions have assured the court that, to comply with these requirements, the commissions intend to use Pub. L. 94-171 data for the final plans.

¶41 Under our constitution, the General Assembly is vested with the legislative power of the state. Colo. Const. art. V, § 1(1). This power, however, is not absolute. One important limitation on the General Assembly's legislative authority is the people's reserved right of initiative. *See id.* § 1(2). The people may exercise this right to enact constitutional amendments limiting the authority of the General Assembly or vesting certain powers with independent constitutional bodies. *See Developmental Pathways v. Ritter*, 178 P.3d 524, 533 (Colo. 2008) ("The concepts of initiative power and self-execution are premised on a similar intent to remove certain provisions from the reach of the legislature."). Thus, when the voters establish an independent constitutional body via initiative with the intent of divesting the General Assembly of authority, the General Assembly's power with regard to that independent body "derives exclusively from [the] Amendment . . . itself." *Colo. Ethics Watch v. Indep. Ethics Comm'n*, 2016 CO 21, ¶ 11, 369 P.3d 270, 272; *see also Yenter v. Baker*, 248 P.2d 311, 316 (Colo. 1952) ("[W]here, as here, the legislature is divested of all discretionary authority . . . , the legislature may not make any other limitation than that provided in the Constitution."). Put differently, any power that the General Assembly asserts over a constitutionally created independent commission that was expressly designed to divest the legislature of authority must derive from the amendment that created the commission, not the constitution's general grant of legislative authority.

30

¶42 The plain language of Amendments Y and Z make clear that the voters intended to create *independent* redistricting commissions; indeed, the Amendments use the term "independent" several times in describing the nature of the commissions. *See* Colo. Const. art. V, §§ 44(1)(b), (2), (3)(a), 46(1)(b), (2), (3)(a); *cf. Yenter*, 248 P.2d at 314 (quoting Black's Law Dictionary for the notion that "independent" means "not subject to control, restriction, modification, or limitation from a given outside source"). Moreover, the Amendments contain provisions intended to ensure that independence. *See, e.g., id.* § 44.2(4)(b)(I)(C) ("Except for public input and comment, nonpartisan staff shall not have any communications about the content or development of any plan outside of public hearings with anyone except other staff members.").[15]

¶43 The Amendments also give the commissions and their staff sole constitutional authority to conduct all of the key tasks in the redistricting process. The commissions and their staff, not the General Assembly, are tasked with

---

[15] The General Assembly, Governor, and Secretary of State focus largely on the anti-gerrymandering purpose of Amendments Y and Z without tethering that purpose to the independence of the commissions. But the voters expressly determined that the "public's interest in prohibiting political gerrymandering is best achieved by creating . . . new and *independent* commission[s]." Colo. Const. art. V, §§ 44(1)(b), 46(1)(b) (emphasis added). To allow the General Assembly to curtail the commissions' independence would thus impair the very mechanism that voters sought to use to fulfill the Amendments' anti-gerrymandering purpose.

"acquir[ing] and prepar[ing] all necessary resources" for the redistricting process, *id.* §§ 44.2(1)(b), 48(1)(b); creating preliminary plans, *id.* §§ 44.4(1)(b), 48.2(1)(b); developing "standards, guidelines, or methodologies" for the development of staff plans, *id.* §§ 44.4(3), 48.2(3); adjusting deadlines if necessary, *id.* §§ 44.4(5)(c), 48.2(5)(c); and adopting a final plan to submit to this court for review, *id.* §§ 44.4(5)(a)–(b), 48.2(5)(a)–(b). By contrast, the General Assembly is assigned only three discrete tasks pertinent to the redistricting process: setting compensation for panelists who assist in selecting commissioners, *id.* §§ 44.1(5)(c), 47(5)(c); appropriating "sufficient funds" for commission expenses, *id.* §§ 44.2(1)(d), 48(1)(d); and providing a per diem allowance for members of the commissions, *id.*

¶44 Together, these provisions "evince[] an intent by Colorado voters to have the Commission[s] interpret and enforce the Amendment[s'] provisions, separate and distinct from the General Assembly." *Developmental Pathways*, 178 P.3d at 532. This intent was made explicit in the 2018 Blue Book, which explained that "Amendment Y limits the role of partisan politics in the congressional redistricting process *by transferring the legislature's role to an independent commission*." Blue Book, *supra* at 10 (emphasis added); *see also id.* at 25, 26 (similar statements regarding the effect of Amendment Z). The voters thus clearly intended to put the redistricting process "beyond the power of the legislature." *Yenter*, 248 P.2d at 314.

32

¶45 The General Assembly's arguments to the contrary are unavailing. First, while Amendments Y and Z contemplate that the General Assembly will appropriate funds for the redistricting process, they do not envision a broader, "continued role for the General Assembly" in the redistricting process. Quite the opposite. *See Developmental Pathways*, 178 P.3d at 532 (noting that the General Assembly is tasked with appropriating funds for the Ethics Commission but nevertheless concluding that "the nature of the Amendment suggests that the voters wanted to minimize legislative involvement").

¶46 The limited role assigned to the General Assembly in Amendments Y and Z stands in contrast to many other constitutional provisions. For example, article V, section 1(9) of the Colorado Constitution—the provision at the core of this court's analysis in *Zaner*, 917 P.2d at 285–86, and *In re House Bill 1078*, 536 P.2d at 314—expressly affords a role for the General Assembly to enact legislation prescribing "the manner of exercising [the powers of initiative and referendum]." Similarly, the constitutional amendments establishing the Independent Ethics Commission expressly invite the General Assembly to enact implementing legislation. Colo. Const. art. XXIX, § 9 ("Legislation may be enacted to facilitate the operation of this article . . . ."). The medical marijuana amendment likewise envisioned implementing legislation. Colo. Const. art. XVIII, § 14(8) (stating that the General Assembly "shall define such terms and enact such legislation as may

33

be necessary for implementation of" the medical marijuana amendment). By contrast, Amendments Y and Z do not contemplate a role for the General Assembly to direct the independent commissions' work or to define constitutional terms like "necessary census data." Accordingly, "[i]t does not lie within the power of the General Assembly to place limitation or qualification upon" such constitutional terms. *Sunray Mid-Continent Oil Co. v. State*, 368 P.2d 563, 566 (Colo. 1961).

¶47 Second, to the extent that the General Assembly argues that it must act to check potential abuses of the commissions' broad authority, we are unconvinced. It is the role of this court to determine whether the commissions have abused their discretion in applying the substantive criteria required of the final plans. *See* Colo. Const. art. V, §§ 44.5(2), 48.3(2). Moreover, the final plans must comply with "one person, one vote" and other federal constitutional requirements of redistricting plans. *See generally Evenwel v. Abbott*, 577 U.S. 937 (2016) (discussing the demands of the "one person, one vote" doctrine). These checks, coupled with the purposefully independent and nonpartisan design of the commissions, *see* Colo. Const. art. V, §§ 44.1, 47, are sufficient to ensure that the commissions do not abuse the substantial authority granted to them under Amendments Y and Z.

¶48 Finally, SB 21-247 cannot be justified on the grounds that it furthers the purposes of Amendments Y and Z. It may be the case that the underlying actions

that SB 21-247 directs the commissions to take would be consonant with the purposes of Amendments Y and Z. But the very act of directing the commissions "impairs" and "limits" the constitutionally mandated independence of the commissions. *See Zaner*, 917 P.2d at 286.

¶49 Accordingly, to the extent that SB 21-247 attempts to direct the actions of the redistricting commissions or their nonpartisan staff, it would be unconstitutional if enacted.[16]

### C. The General Assembly Cannot Define the Standard that a Court Applies When Reviewing Compliance with the Technical Provisions of Amendments Y and Z

¶50 In addition to attempting to direct the actions of the redistricting commissions, SB 21-247 seeks to direct courts, instructing that "[i]n any legal proceeding challenging compliance" with the "technical rather than substantive provisions" of Amendments Y and Z, a court must apply a "substantial compliance" standard. Again, however, we determine that the General Assembly lacks the authority to make such a demand.

---

[16] Given that the interrogatories before us pertain only to the constitutionality of SB 21-247, we decline to opine on the constitutionality of any other legislation directing the operations of the independent redistricting commissions or their nonpartisan staff.

¶51 As noted, the General Assembly is vested with the legislative power of the state. Colo. Const. art. V, § 1(1). In exercising that power, the legislature has instructed the judiciary how best to discern legislative intent when interpreting statutes. *See, e.g.*, §§ 2-4-201 to -216, C.R.S. (2020) (providing general rules for construction of statutes). Similarly, the General Assembly has provided in some instances that a "substantial compliance" standard should be applied to certain statutory claims. *See, e.g.*, § 1-1-103(3), C.R.S. (2020); § 8-47-104, C.R.S. (2020); § 15-2.5-304, C.R.S. (2020); § 31-12-107(1)(g), C.R.S. (2020).

¶52 But whatever the General Assembly's power to establish the standard for compliance with its own enactments, such power does not extend to *constitutional* provisions. Interpreting the constitution—a task that encompasses the decision of what standard to apply to a given constitutional claim—"is, and has always been, a judicial function." *In re Interrogatories Concerning House Bill 1078*, 536 P.2d at 316 (citing *Marbury v. Madison*, 5 U.S. 137 (1803)); *see also Colo. Gen. Assembly v. Lamm*, 704 P.2d 1371, 1379 (Colo. 1985) (noting that "interpretation of the constitution" is "a function at the very core of the judicial role"). Accordingly, because the power to define the standard applicable to a constitutional claim is vested in the courts, *see* Colo. Const. art. VI, § 1, the General Assembly may not constitutionally exercise that power, Colo. Const. art. III ("[N]o person or collection of persons charged with the exercise of powers properly belonging to one of these

36

departments shall exercise any power properly belonging to either of the others, except as in this Constitution expressly directed or permitted.").

¶53    The General Assembly asserts that this cannot be so because it has already provided in a different statute that a "substantial compliance" standard should apply to claims relating to article X, section 20 of the Colorado Constitution. *See* § 1-7-907, C.R.S. (2020). But the General Assembly enacted that statutory provision only *after* this court established substantial compliance as the applicable standard for such claims in *Bickel v. City of Boulder*, 885 P.2d 215, 227 (Colo. 1994).[17] Section 1-7-907 simply codified this court's holding, and its enactment does not stem from a broader authority to define the standard applicable to constitutional claims.

¶54    To be clear: This court could—and very well might—apply a "substantial compliance" standard to challenges alleging that the commissions failed to comply with non-substantive provisions of Amendments Y and Z. *But see* Colo. Const. art. V, §§ 44.5(2)–(3), 48.3(2)–(3) (specifying that an "abuse of discretion" standard applies in our review as to whether the commission complied with the specified

---

[17] As we have recognized elsewhere, "the rule of substantial compliance is firmly grounded in prior decisions of this court." *Meyer v. Lamm*, 846 P.2d 862, 875 (Colo. 1993). We have always applied that standard of our own accord, not on the suggestion of the General Assembly. *See id.* 875–76 (collecting cases).

substantive criteria). But the General Assembly does not have the power to *require* this court or any other court to apply such a standard to a constitutional claim. Accordingly, the provision of SB 21-247 requiring courts to apply a "substantial compliance" standard to claims alleging violations of procedures laid out in Amendments Y and Z would be unconstitutional if enacted.

## V. Conclusion

¶55 The provisions of SB 21-247 that seek to direct the operation of the independent redistricting commissions and their nonpartisan staff would violate article V, sections 44 to 48.4 of the Colorado Constitution if enacted. And the provision of SB 21-247 that seeks to define the standard that courts should apply to determine compliance with Amendments Y and Z would violate article III and article VI, section 1 of the Colorado Constitution if enacted. Accordingly, we answer both of the General Assembly's questions in the negative.

**JUSTICE HOOD** dissents, and **JUSTICE GABRIEL** joins in the dissent.

JUSTICE HOOD, dissenting.

¶56 I respectfully dissent from the majority's response to the first interrogatory, which I would answer in the affirmative. I join the majority's response to the second interrogatory.

¶57 The majority makes several indisputable points: (1) while our constitution vests the General Assembly with legislative authority, the people retain the power of initiative, maj. op. ¶ 41; (2) the people may use their initiative power to create an independent constitutional body, *id.*; (3) Colorado's redistricting process has been a partisan, litigious mess for years, *see id.* at ¶¶ 1, 12; and (4) the people overwhelmingly approved Amendments Y and Z to try to clean up that mess by transferring redistricting authority to the commissions, *id.* at ¶ 13. I quarrel with none of this.

¶58 Where I do part company with the majority is over what role, if any, remains for our state's elected representatives to facilitate the efforts of the redistricting commissions by addressing matters as to which Amendments Y and Z are silent. The majority says this: "[A]ny power that the General Assembly asserts over a constitutionally created independent commission that was expressly designed to divest the legislature of authority must derive from the amendment that created the commission, not the constitution's general grant of legislative authority." *Id.* at ¶ 41. As the majority sees it, this means that the General Assembly can do no

1

more than what Amendments Y and Z explicitly say it can do—pay the bills. *Id.* at ¶ 43.

¶59 It reaches this conclusion even though nothing in Amendments Y and Z explicitly prohibits the General Assembly from enacting the policies of SB 21-247. *See* Colo. Const. art. V, §§ 44–48.4. And even though the COVID-19 pandemic "threw a wrench," maj. op. ¶ 20, into a new, and thus completely untested, redistricting process right before the looming 2022 election cycle.

¶60 The majority arrives at this troubling result because it misinterprets our precedent. Most significantly, it gets the presumption about the legislature's residual authority exactly backwards: Rather than focusing on the General Assembly's broad plenary authority to legislate, which requires us to presume that the legislature can act unless the constitution explicitly says that it cannot, the majority limits the General Assembly to only that which the Amendments expressly permit. This is new ground.

¶61 To understand how this is new, it is helpful to examine the backdrop against which this debate occurs:

> The people of Colorado, in adopting the state constitution, created the General Assembly and vested it with plenary power to adopt general laws, subject only to the restraints and limitations of the state and federal constitutions. The General Assembly, therefore, *may enact any law* not expressly or inferentially prohibited by the constitution of the state or of the nation.

2

*People in Int. of Y.D.M.*, 593 P.2d 1356, 1359 (Colo. 1979) (emphasis added) (citations omitted). So, we start with the premise that our duly elected representatives may exercise their constitutional prerogative to legislate unless the constitution says otherwise.

¶62 This court has long said that the General Assembly may supplement the dictates of the state constitution so long as its actions "further[] the purpose of," "or facilitate[] . . . enforcement" of, constitutional provisions; conversely, the legislature may not "impair[], limit[] or destroy[]" rights granted by those constitutional provisions. *Zaner v. City of Brighton*, 917 P.2d 280, 286 (Colo. 1996); *accord Yenter v. Baker*, 248 P.2d 311, 316 (Colo. 1952) ("Where the legislature is vested with power, subject to limitation, it has authority to make any restriction not less than that named in such limitation; but where [the statute and constitution directly conflict], . . . the legislature may not make any other limitation than that provided in the Constitution.").

¶63 As the majority tells us, "In examining the interaction between a challenged statute and a constitutional amendment, our inquiry focuses on whether the two provisions necessarily conflict." Maj. op. ¶ 32. "The test for the existence of a conflict is: Does one authorize what the other forbids or forbid what the other

3

authorizes?" *Id.* (quoting *In re Interrogatories Propounded by Senate Concerning House Bill 1078*, 536 P.2d 308, 313 (Colo. 1975)).[1]

¶64 But as soon as the majority finishes reciting this precedent, it swallows the rule by proclaiming that "the very act of directing the commissions 'impairs' and 'limits' the[ir] constitutionally mandated independence." *Id.* ¶ 48 (quoting *Zaner*, 917 P.2d at 286). Surely, this proves too much. If any direction is invalid, the legislature is altogether evicted from its historical gap-filling role—evicted in a way flatly at odds with what we've said repeatedly in the past.

¶65 For example, nearly half a century ago, this court addressed two conflicting voter initiatives and the General Assembly's tie-breaking statute, which provided, "in case of adoption of conflicting provisions, the one which receives the greatest number of affirmative votes shall prevail." *House Bill 1078*, 536 P.2d at 314 (quoting § 1-40-113, C.R.S. (1973)). This court held that the statute enhanced, rather than limited, the right of the people to amend our constitution. *Id.* In short, we permitted the General Assembly to supplement the constitutional provision because the legislation facilitated the operation of the voter-initiative provision.

---

[1] Contrary to the majority's veiled assertion, maj. op. ¶ 46, this framework governs even when the constitutional amendment at issue is self-executing, *see Developmental Pathways v. Ritter*, 178 P.3d 524, 533 (Colo. 2008); *Zaner*, 917 P.2d at 286.

¶66 The majority plots a new course primarily based on two of our cases addressing the Independent Ethics Commission ("IEC") created by Amendment 41. Maj. op. ¶¶ 41, 44.

¶67 In *Colorado Ethics Watch v. Independent Ethics Commission*, 2016 CO 21, ¶ 12, 369 P.3d 270, 272, we concluded that Amendment 41 allows legislation creating judicial review of the IEC's enforcement decisions but not its nonenforcement decisions. Although we said that "any authority that the General Assembly may exercise regarding IEC's operations derives exclusively from Amendment 41 itself," *id.* at ¶ 11, 369 P.3d at 272, we cited no legal authority and did not discuss our conflicting precedents—things you might expect if we were announcing an exception to a fundamental constitutional principle.

¶68 Indeed, our statement wasn't even necessary to the resolution of that case. Judicial review of nonenforcement decisions was unconstitutional—not because the General Assembly's authority to direct the operations of an independent commission must come from the establishing constitutional amendment—but because Amendment 41 explicitly prohibited legislation that "limits or restricts" the IEC's powers. *Id.* at ¶ 12, 369 P.3d at 272 (alterations omitted) (quoting Colo. Const. art. XXIX, § 9). Judicial review of nonenforcement decisions limited the IEC because Amendment 41 expressly invited penalty-setting legislation in the enforcement context, implying that legislation about nonenforcement decisions

5

was prohibited. *Id.* ("[B]ecause Amendment 41 only permits the legislature to act with respect to IEC's enforcement actions, the General Assembly cannot constitutionally enact legislation pertaining to any IEC decisions that do not involve enforcing penalties."). Perhaps most importantly for our purposes, we held that the General Assembly could provide for judicial review of enforcement decisions even though Amendment 41 says nothing about judicial review at all. *See id.* at ¶¶ 8, 12, 14, 369 P.3d at 272–73.

¶69 The second IEC case is *Developmental Pathways v. Ritter*, 178 P.3d 524, 526 (Colo. 2008), involving a constitutional challenge to the gift ban under Amendment 41. True, we said that "[t]he concepts of initiative power and self-execution are premised on a similar intent to remove certain provisions from the reach of the legislature." *Id.* at 533. But closer inspection of this opinion reveals that this court never intended to banish the legislature altogether. Although we found Amendment 41 to be self-executing, and thus beyond the reach of "the normal legislative process," we noted that the "legislature may implement or facilitate a self-executing amendment." *Id.*

¶70 Neither of these opinions purported to wholly deprive the General Assembly of its plenary authority to legislate, even when faced with an independent commission. On the contrary, they simply reiterate that the General

Assembly cannot undermine the provisions giving life to the independent commission. In sum: no conflict, no problem.

¶71    And I see no conflict here. The purpose of Amendments Y and Z was to end the "practice of political gerrymandering, whereby . . . districts are purposefully drawn to favor one political party or incumbent politician over another." Colo. Const. art. V, §§ 44(1)(a), 46(1)(a). To that end, the Amendments reassigned the General Assembly's power to "draw maps" to the commissions. *Id.* §§ 44(1)(b), 46(1)(b); *see also* Legis. Council, Colo. Gen. Assembly, Rsch. Pub. No. 702-2, *2018 State Ballot Information Booklet* 8 (2018) (the "Blue Book") ("Amendment Y transfers the authority to draw congressional district maps from the state legislature to a newly created Independent Congressional Redistricting Commission . . . ."); Blue Book, *supra*, at 23 ("Amendment Z replaces the reapportionment commission with the Independent Legislative Redistricting Commission . . . , which is charged with drawing the state's legislative districts.").

¶72    SB 21-247 doesn't interfere with the commissions' exclusive line-drawing power; it simply tells them to look at certain high-quality federal data about who lives where while they're drawing lines around us. Specifically, the bill provides that, for this round of redistricting, the commissions must draft preliminary plans using the Census Bureau's apportionment (total population) data plus other data selected by the commissions from governmental sources, and that the staff plans

must reflect final census data, which, for this year only, includes the untabulated version of the Pub. L. 94-171 data expected to be released in August.

¶73 So, SB 21-247 isn't the first stop down the slippery slope back to gerrymandering. It is a guardrail that guarantees that the commissions will use apolitical data about where we live when they exercise their discretion to sort us into districts of equal population size that preserve compact communities of interest and that maximize political competition. *See* Colo. Const. art. V, §§ 44.3, 48.1. Requiring the commissions to use a specific source of neutral demographic data does not at all infringe on the commissions' autonomy during the line-drawing process.

¶74 Of course, my conclusion would be different if the General Assembly sought to require the use of data provided by a political party or another partisan entity. That would conflict with the Amendments' anti-gerrymandering purpose.

¶75 Similarly, it would be unconstitutional for the General Assembly to directly contradict anything that's spelled out in the Amendments, such as the criteria the commission must use in drawing maps. But neither the Amendments nor the Blue Book say where the commissions should get their demographic data before they carve up the state.

¶76 If anything, the Amendments imply that census data is exactly what the commissions should be looking at. Both commissions' deadlines for their

8

preliminary maps are a function, in part, of when "the necessary census data are available." *Id.* §§ 44.4(1), 48.2(1); *see also id.* §§ 44(3)(c), 46(3)(c) ("'Race' or 'racial' means a category of race or ethnic origin documented in the federal decennial census."); *id.* §§ 44.1(1), 47(1) ("After each federal decennial census of the United States, the members of the commission shall be appointed and convened . . . .").

¶77 The Independent Congressional Redistricting Commission concedes that, for the congressional redistricting process, Amendment Y's "precise mathematical population equality" requirement, *see id.* § 44.3(1)(a), "requires that the Commission's final plan be based on the final 2020 redistricting-level census data." Given that admission, I don't see how the provisions of SB 21-247 requiring the use of that same data could conflict with Amendment Y.

¶78 Nor does the provision requiring at least one public hearing on a map based on final census data conflict with the Amendments. Another purpose of the Amendments is to "provide[] the public with the ability to be heard as redistricting maps are drawn." *Id.* §§ 44(1)(f), 46(1)(f). As such, "[t]he commission[s] must, to the maximum extent practicable, provide opportunities for Colorado residents to present testimony at hearings held throughout the state." *Id.* §§ 44.2(3)(b), 48(3)(b). Since the commissions plan to use final census data for their final plans, maj. op. ¶ 39 n.14, requiring a single public hearing after that data is plugged in would

9

facilitate the Amendments by giving the public the opportunity to weigh in on something closer to the final maps despite the chaos of the pandemic.

¶79 So, SB 21-247 fills gaps in the Amendments without undermining the commissions' power to independently draw Colorado's political maps. For decades, we have permitted such complementary gap-filling by the legislature. That should hold true again today.

¶80 I join the majority's response to the second interrogatory but respectfully dissent from its response to the first, which I would instead answer in the affirmative.

I am authorized to state that JUSTICE GABRIEL joins in this dissent.